192 P.3d 306 (2008)
AMERICAN LEGION POST #149, Appellant,
v.
WASHINGTON STATE DEPARTMENT OF HEALTH and the Kitsap County Health District, Respondents.
No. 79839-7.
Supreme Court of Washington, En Banc.
September 11, 2008.
*312 Shawn Timothy Newman, Attorney at Law, Olympia, WA, for Appellant.
Pamela H. Anderson, Mark Hodgeman Calkins, Attorney Generals Office, Olympia, WA, Philip Andrew Bacus, Kitsap County Prosecutors Office, Port Orchard, WA, for Respondents.
FAIRHURST, J.
ś 1 Appellant, American Legion Post No. 149 (Post) seeks review of a Thurston County Superior Court decision granting the respondents', Department of Health (DOH) and Kitsap County Health District (KCHD), motions for summary judgment and dismissing the case with prejudice. The questions presented in this case are whether the smoking in public places act (Act), chapter 70.160 RCW, prohibits smoking in the Post and, if it does, whether the prohibition is constitutional. We hold smoking is prohibited in the Post under the Act because it is a "place of employment" and the prohibition, as applied to the Post, is constitutional.

I. STATEMENT OF THE CASE
ś 2 In 1985, the legislature adopted the clean indoor air act, which limited smoking in some public places. LAWS OF 1985, ch. 236. The 1985 act exempted "private facilities" and "private enclosed workplace[s], within a public place" from the smoking ban. Former RCW 70.160.020(2) (1985), amended by LAWS OF 2006, ch. 2, § 2; RCW 70.160.060.
ś 3 In 2006, Washington voters enacted Initiative Measure 901. LAWS OF 2006, ch. 2. Chapter 70.160 RCW is now entitled "Smoking in Public Places." Initiative 901 expanded the prohibition on smoking in public places by amending the definition of a "`[p]ublic place'" to include facilities such as schools, bars, bowling alleys, and casinos. Compare former RCW 70.160.020(2), with RCW 70.160.020(2). Initiative 901 also added a prohibition against smoking "in any place of employment." RCW 70.160.030,.020(3) (defining a "`[p]lace of employment'"). A civil fine of up to $100 may be imposed for an intentional infraction of the Act. RCW 70.160.070(1). Enforcement authority is vested in local health departments and local law enforcement. RCW 70.160.070(3), .080.
ś 4 Local health departments may adopt regulations to implement the Act. RCW 70.160.080.
ś 5 In April 2006, the Kitsap County Board of Health adopted Ordinance 2006-2, the clean indoor air ordinance (Ordinance), which adopted and implemented chapter 70.160 RCW as amended by Initiative 901. The Ordinance mirrors the Act[1] and delegates enforcement authority to the KCHD.
ś 6 The Post is a nonprofit, private fraternal organization whose membership of 591 people is limited to those who served in the military or the Merchant Marine during specific time periods. Members must either be on active military duty or be honorably discharged. The Post's primary purpose is to *313 provide services and benefits to veterans and their families. It seeks to unite its membership "in the bonds of fraternity, benevolence, and charity." Clerk's Papers (CP) at 103.
ś 7 The Post owns and operates a facility in Bremerton, Washington, that is open only to members and guests. The facility is maintained, in part, to provide a social atmosphere for the members. The Post employs seven people to run the facility.[2] The Post permits members and guests to smoke tobacco products in its facility when it is not open to the public.[3] Smoking occurs in a lounge where employees are required to work.
ś 8 In May 2006, the KCHD issued a notice that the Post was violating the Act by allowing individuals to smoke inside the Post and demanded immediate compliance. The Post refused and filed an action in the Thurston County Superior Court seeking a declaratory judgment and injunctive relief under the Administrative Procedure Act (APA),[4] chapter 34.05 RCW, and the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, to preclude KCHD and the DOH from prohibiting smoking in the Post.
ś 9 The parties filed cross motions for summary judgment. Following oral argument, the trial court judge issued an order granting KCHD's and DOH's motions for summary judgment, denying the Post's motion for summary judgment, and dismissing the Post's complaint with prejudice. We granted direct review.

II. ISSUES
1. Whether smoking is prohibited under the Act in private facilities that are places of employment.
2. Whether the Post has standing to challenge the Act as it applies to its members' constitutional rights.
3. Whether the Act violates article I, section 7 of the Washington Constitution.
4. Whether the Act violates article I, section 12 of the Washington Constitution.
5. Whether the Act violates the equal protection clause of the United States Constitution.
6. Whether the Act is void for vagueness under the due process clauses of the Washington Constitution and United States Constitution.
7. Whether any party is entitled to attorney fees.

III. ANALYSIS

A. Standard of review
ś 10 The trial court granted summary judgment for KCHD and DOH. This court is asked to interpret RCW 70.160.011,.020, .030, and .060. We review rulings on summary judgment and issues of statutory interpretation de novo. Udall v. T.D. Escrow Servs., Inc., 159 Wash.2d 903, 908, 154 P.3d 882 (2007). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." CR 56(c).

B. Whether smoking is prohibited under the Act in private facilities that are places of employment
ś 11 The first issue raised is whether the Act prohibits smoking in a private facility, such as the Post, that is also a place of employment. Standard rules of statutory construction apply to initiatives. Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2000). "[I]n determining the meaning of a *314 statute enacted through the initiative process, the court's purpose is to ascertain the collective intent of the voters who, acting in their legislative capacity, enacted the measure." Id. "Where the language of an initiative enactment is `plain, unambiguous, and well understood according to its natural and ordinary sense and meaning, the enactment is not subject to judicial interpretation.'" Id. (quoting State v. Thorne, 129 Wash.2d 736, 762-63, 921 P.2d 514 (1996)); Brown v. State, 155 Wash.2d 254, 267, 119 P.3d 341 (2005) (noting that an initiative must be read as written, not as a court would like it to be written). "`In construing the meaning of an initiative, the language of the enactment is to be read as the average informed lay voter would read it.'" State v. Brown, 139 Wash.2d 20, 28, 983 P.2d 608 (1999) (quoting W. Petroleum Imp., Inc. v. Friedt, 127 Wash.2d 420, 424, 899 P.2d 792 (1995)).
ś 12 An initiative must be read in light of its various provisions, rather than in a piecemeal approach, McGowan v. State, 148 Wash.2d 278, 288, 60 P.3d 67 (2002), and in relation to the surrounding statutory scheme, Brown, 155 Wash.2d at 268, 119 P.3d 341. A court must, when possible, "give effect to every word, clause and sentence of a statute." Cox v. Helenius, 103 Wash.2d 383, 387, 693 P.2d 683 (1985). The "goal is to avoid interpreting statutes to create conflicts between different provisions so that we achieve a harmonious statutory scheme." Echo Bay Cmty. Ass'n v. Dep't of Natural Res., 139 Wash.App. 321, 327, 160 P.3d 1083 (2007), review denied, 163 Wash.2d 1016, 180 P.3d 1290 (2008). If there is an apparent conflict between two provisions, the more specific and more recently enacted statute is preferred. Tunstall v. Bergeson, 141 Wash.2d 201, 210, 5 P.3d 691 (2000). Only if the language is ambiguous may the court examine extrinsic sources such as a voter's pamphlet. Brown, 155 Wash.2d at 267, 119 P.3d 341.
ś 13 Finally, this court will not substitute its judgment for that of the electorate unless the initiative contravenes state or federal constitutional provisions.[5]Amalgamated Transit, 142 Wash.2d at 206, 11 P.3d 762. Conversely, the court will not "declare laws passed in violation of the constitution valid based upon considerations of public policy." Id.
ś 14 The Act prohibits smoking "in a public place or in any place of employment."[6] RCW 70.160.030. "`Public place'" is defined as "that portion of any building or vehicle used by and open to the public, regardless of whether the building or vehicle is owned in whole or in part by private persons or entities, the state of Washington, or other public entity." RCW 70.160.020(2). The final sentence of the definition of a "`[p]ublic place'" provides "[t]his chapter is not intended to restrict smoking in private facilities which are occasionally open to the public except upon the occasions when the facility is open to the public."[7] RCW 70.160.020(2). Smoking *315 is not prohibited in a private enclosed workplace within a "public place." RCW 70.160.060. All parties agree that the Post is not a "public place."
ś 15 Smoking is also prohibited in "any place of employment."[8] RCW 70.160.030. A "`[p]lace of employment'" is defined as "any area under the control of a public or private employer which employees are required to pass through during the course of employment."[9] RCW 70.160.020(3).

1. RCW 70.160.020(2)
ś 16 The Post's first argument is that smoking is not prohibited in its facility because RCW 70.160.020(2) explicitly states, "[t]his chapter is not intended to restrict smoking in private facilities which are occasionally open to the public except upon the occasions when the facility is open to the public." The Post argues "chapter" refers to the entire Act and if the voters wanted the exception to apply only to the definition of a "public place," the initiative should have modified this sentence.[10] Thus, the Post argues, the plain language of the statute exempts private facilities from the smoking ban.
ś 17 The Post's reading of RCW 70.160.020(2) is inconsistent with the surrounding statutory scheme, the intent of the voters, and the relevant principles of statutory construction. This court assumes the legislature does not intend to create inconsistent statutes. State ex rel. Peninsula Neighborhood Ass'n v. Dep't of Transp., 142 Wash.2d 328, 342, 12 P.3d 134 (2000). "Statutes are to be read together, whenever possible, to achieve a `harmonious total statutory scheme. . . which maintains the integrity of the respective statutes.'" Id. (alteration in original) (internal quotation marks omitted) (quoting Employco Pers. Servs., Inc. v. City of Seattle, 117 Wash.2d 606, 614, 817 P.2d 1373 (1991)).
ś 18 The exception for private facilities is part of the definition of a "public place." The exception is not repeated under the definition of a "place of employment" (unlike the exception for private residences not used to provide social service care), nor is it a separate statutory provision. The private facilities exception was part of the former Act, see former RCW 70.160.020(2), and before Initiative 901 its meaning was clearâ smoking was generally prohibited in public places and a private facility was not to be considered a public place if it was occasionally open to the public, except for the occasions when the facility was open to the public. The problem is Initiative 901 broadened the prohibition against smoking to include "any place of employment," RCW 70.160.030, and the interrelationship between the private facilities exception and prohibition against smoking in any place of employment is unclear.
ś 19 Arguably, the phrase "[t]his chapter" could be read to exempt all private facilities *316 from the smoking ban. However, such a reading would eviscerate much of the Act and interfere with the express intent of the voters, which was to protect employees regardless of whether their place of employment is a public place. See RCW 70.160.011. A private facility is the antithesis of a public place under this statute,[11] which defines a "`[p]ublic place'" as the "portion of any building or vehicle used by and open to the public" regardless of who owns the building or vehicle. RCW 70.160.020(2). The private facilities exemption acts as a temporal limitation on the definition of a public placeâ if a facility is occasionally open to the public, smoking is prohibited only during the time that it is open to the public.
ś 20 In enacting Initiative 901, voters intended to enlarge the smoking ban because of increased concerns with the effects of secondhand smoke.[12]
The people of the state of Washington recognize that exposure to second-hand smoke is known to cause cancer in humans. Second-hand smoke is a known cause of other diseases including pneumonia, asthma, bronchitis, and heart disease. Citizens are often exposed to second-hand smoke in the workplace, and are likely to develop chronic, potentially fatal diseases as a result of such exposure. In order to protect the health and welfare of all citizens, including workers in their places of employment, it is necessary to prohibit smoking in public places and workplaces.

RCW 70.160.011 (emphasis added). Unlike the former clean indoor air act, the voters in Initiative 901 recognized the importance of protecting workers in their places of employment from harmful exposure to secondhand smoke. Compare former RCW 70.160.010 (1985), repealed by LAWS OF 2006, ch. 2, § 7, with RCW 70.160.011. To this end, the initiative added a new prohibition against smoking in any place of employment, which was clearly explained to the voters.[13] Initiative 901's official ballot title explained, "[t]his measure would prohibit smoking in buildings and vehicles open to the public and places of employment, including areas within 25 feet of doorways and ventilation openings unless a lesser distance is approved." CP at 251 (State of Washington Voters' Pamphlet, General Election 9 (Nov. 8, 2005)). The explanatory statement in the voters' pamphlet also made the effect of the initiative clear to the votersâ it explained that Initiative 901 would expand the term "public place" and "[s]moking would also be prohibited in `places of employment.'" CP at 252 (State of Washington Voters' Pamphlet, General Election 10 (Nov. 8, 2005)).
ś 21 Finally, the statute itself plainly prohibits smoking "in a public place or in any place of employment." RCW 70.160.030 (emphasis added). The exclusion of private facilities from the entire Act, as proposed by the Post, creates a discordant statutory scheme. The exclusion of all private facilities conflicts with the intent of the voters and the plain language of RCW 70.160.030. For example, an office building that is not open to the public is a private facility.[14] Under the Post's reading of RCW 70.160.020(2), smoking would be allowed in the building even though hundreds of employees may be involuntarily *317 subjected to the dangers of secondhand smoke. Using the Post's analysis, it would follow that any place of employment that is not a public place may be considered a private facility and, thus, the only places of employment where smoking would be prohibited would be in public places. This clearly was not the intent of the voters when they enacted Initiative 901, and our purpose is to ascertain the collective intent of the voters who enacted Initiative 901, Amalgamated Transit, 142 Wash.2d at 205, 11 P.3d 762. "[A] `fundamental guide to statutory construction is that the spirit or intention of the law prevails over the letter of the law.'" Janovich v. Herron, 91 Wash.2d 767, 772, 592 P.2d 1096 (1979) (quoting State v. (1972) Dan J. Evans Campaign Comm., 86 Wash.2d 503, 508, 546 P.2d 75 (1976)).
ś 22 Thus, we construe the Act in such a way as to achieve a harmonious statutory scheme and give effect to the will of the voters by preferring the more specific and more recently enacted prohibition of smoking in any place of employment.[15] If a facility is a "public place," smoking is prohibited. If a facility is a "place of employment," regardless of whether it is a "public place," smoking is prohibited.[16] Thus, the exception for private facilities is an exception to the definition of a "public place" and does not apply to the prohibition against smoking in "any place of employment."

2. RCW 70.160.060
ś 23 The Post's second argument is that it is exempt from the smoking prohibition under RCW 70.160.060 ("[t]his chapter is not intended to regulate smoking in a private enclosed workplace, within a public place, even though such workplace may be visited by nonsmokers"). The impact of Initiative 901 on RCW 70.160.060 is unclear. RCW 70.160.060 was not explicitly amended by Initiative 901. When viewed in terms of the former clean indoor air act, the purpose of RCW 70.160.060 was clearâ even though smoking was prohibited in public places except for designated smoking areas, former RCW 70.160.030 (1985), smoking within a private enclosed workplace within a public place was allowed, RCW 70.160.060. The question is what impact, if any, the expansion of the smoking ban to places of employment had on the exception for smoking in private enclosed workplaces within public places.
ś 24 The Post argues the phrase "private enclosed workplace" is synonymous with a "place of employment," such that smoking in a place of employment is not prohibited. This argument ignores the semantic differences between a "private enclosed workplace" and "place of employment." The term "private enclosed workplace" is used in the Act only in RCW 70.160.060 and is undefined. Because "workplace" is undefined, we look to its ordinary meaning.[17] The ordinary meaning *318 of a "private enclosed workplace" is an area where work is done that is closed in by some barrier and is not open to the public. In contrast, a "`[p]lace of employment'" is statutorily defined as "any area under the control of a public or private employer which employees are required to pass through during the course of employment." RCW 70.160.020(3). The terms "private enclosed workplace" and "place of employment" are not interchangeable.
ś 25 RCW 70.160.060 exempts "a private enclosed workplace, within a public place" from the smoking prohibition. "`Public place'" is defined in RCW 70.160.020(2). RCW 70.160.060 exempts areas such as an enclosed manager's office in the back of a retail store. It does not, by its terms, apply to private enclosed workplaces in private places. Thus, the Post is not exempt from the smoking ban under RCW 70.160.060 because it is not a public place.
ś 26 In short, smoking is prohibited in a private facility when it meets the statutory definition of a "place of employment." The exception for private facilities applies to the definition of a "public place," not a "place of employment," and RCW 70.160.060 does not apply when a place does not meet the definition of a "public place." We affirm the trial court's ruling.

C. Whether the Post has standing to challenge the Act as it applies to its members' constitutional rights
ś 27 The Post raises several constitutional claims on its own behalf and on behalf of its members.[18] KCHD asserts the Post lacks standing to argue that the Act violates its members' constitutional rights.[19] Standing requirements tend to overlap the requirements for justiciability under the UDJA. Amalgamated Transit, 142 Wash.2d at 203, 11 P.3d 762. There is a two-part test for standing under the UDJA. Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wash.2d 791, 802, 83 P.3d 419 (2004) (Grant County II). First, a party must be within the "`zone of interests to be protected or regulated by the statute'" in question. Id. (internal quotation marks omitted) (quoting Save a Valuable Env't v. City of Bothell, 89 Wash.2d 862, 866, 576 P.2d 401 (1978)). Second, the party must have suffered an "injury in fact." Id. (internal quotation marks omitted). In this case, the Post clearly has standing on its own behalf because it is within the zone of interests regulated by the Act and the Post was cited by KCHD for noncompliance with the Act. However, the Post, as a nonprofit corporation, is limited in the types of constitutional claims it can raise. Thus, it is necessary to distinguish which of the constitutional claims asserted by the Post can be brought on its own behalf.
ś 28 "[A] corporation is a `person' within the meaning of the equal protection and due process of law clauses." Grosjean v. Am. Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660 (1936); see Olympic Forest Prods., Inc. v. Chaussee Corp., 82 Wash.2d 418, 424, 511 P.2d 1002 (1973). However, while a corporation's property rights are protected by the due process clause, the liberty guaranteed by the due process clause applies only to natural persons. Hague v. Comm. for Indus. Org., 307 U.S. 496, 527, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). A corporation cannot bring a claim on its own behalf on the basis it was denied a liberty interest without due process of law. Id. Thus, the Post cannot claim the Act interferes with its liberty interests *319 in violation of due process, but it can claim the ban denies it a property interest without due process, violates equal protection, or is void for vagueness.
ś 29 The Post also claims the ban violates its right to privacy under article I, section 7 of the Washington Constitution.[20] The pivotal question is whether a corporation is considered a "person" for the purposes of article I, section 7. Washington courts have recognized that corporations are protected by article I, section 7, albeit in the search and seizure context. See, e.g., Centimark Corp. v. Dep't of Labor & Indus., 129 Wash.App. 368, 375, 119 P.3d 865 (2005) (analyzing inspection of corporation under both the Fourth Amendment and article I, section 7); Thurston County Rental Owners Ass'n v. Thurston County, 85 Wash.App. 171, 184-87, 931 P.2d 208 (1997) (analyzing association's claim that fees, permits, and inspections of on-site septic systems were unconstitutional invasions of privacy under article I, section 7). We assume for the preliminary purposes of standing, without holding, that the Post may claim that the Act violates its rights under article I, section 7.
ś 30 In addition to personal standing, a party may have standing in a representational capacity. Grant County II, 150 Wash.2d at 803, 83 P.3d 419. An organization "has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n., 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). This court has adopted a more liberal approach to standing "when a controversy is of substantial public importance, immediately affects significant segments of the population, and has a direct bearing on commerce, finance, labor, industry, or agriculture." Grant County II, 150 Wash.2d at 803, 83 P.3d 419.
ś 31 In a similar case, an organization brought a suit challenging a smoking ban on behalf of its members. NYC C.L.A.S.H., Inc. v. City of New York, 315 F.Supp.2d 461, 465 (S.D.N.Y.2004). The purpose of C.L.A.S.H. was "to promote the interests of smokers and defend smoker's rights." Id. at 469. The court determined that C.L.A.S.H. met all three prongs of the Hunt representational standing test because the individual members had standing, smoking was germane to the purpose of the organization, and individual member participation was not required for a declaratory judgment. Id.
ś 32 After considering C.L.A.S.H., the trial court in this case determined that, unlike C.L.A.S.H., smoking was not germane to the Post's purpose and, consequently, the Post lacked representational standing. The Post argues the trial court erred because smoking is germane to the Post's purpose of providing a social center for veterans and their families. The Post also argues its members have individual standing because the smoking ban "impinge[s] on their existing privacy, associations and social relationships at the Post causing them irreparable harm and is likely to result in a loss of membership." CP at 104.
ś 33 We affirm the trial court's ruling. The American Legion is a corporation established by federal statute, 36 U.S.C. § 21701(a), for the purposes of upholding and defending the constitution, promoting peace and goodwill throughout the world, "preserv[ing] the memories and incidents of the 2 World Wars and the other great hostilities fought to uphold democracy," "cement[ing] the ties and comradeship born of service," and "consecrat[ing] the efforts of its members to mutual helpfulness and service to their country." 36 U.S.C. § 21702(3)-(5). The Post's primary purpose, as a local chapter, is to provide services and benefits to veterans and their families. It seeks to unite its membership "in the bonds of fraternity, benevolence, and charity." CP at 103.
*320 ś 34 Smoking is not germane to any of the American Legion's or local Post's purposes. Consequently, the Post lacks representational standing under the Hunt test and is precluded from asserting that the Act violates its members' liberty interests without due process of law.

D. Whether the Act violates article I, section 7 of the Washington Constitution
ś 35 The Post claims the Act interferes with its privacy rights under the state constitution. The state constitution provides, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7. When considering whether the state constitution provides greater protection than the federal constitution, this court engages in a two-step inquiry. Madison v. State, 161 Wash.2d 85, 93, 163 P.3d 757 (2007) (plurality opinion). First, the court must determine "whether `a provision of the state constitution should be given an interpretation independent from that given to the corresponding federal constitutional provision.'" Id. (quoting State v. McKinney, 148 Wash.2d 20, 26, 60 P.3d 46 (2002)). Normally, this first step involves an analysis of the six nonexclusive Gunwall[21] factors. However, "[o]nce this court has established that a state constitutional provision warrants an analysis independent of a particular federal provision," a Gunwall analysis is unnecessary. Id. at 94, 163 P.3d 757. It is well-settled law that article I, section 7 may provide greater protection than the federal constitution, especially in cases of governmental searches and seizures. McKinney, 148 Wash.2d at 26, 60 P.3d 46. Thus, it is not necessary for this court to reconsider the factors outlined in Gunwall to determine whether to apply a constitutional analysis under article I, section 7 in a new context. Id.; Andersen v. King County, 158 Wash.2d 1, 44, 138 P.3d 963 (2006) (plurality opinion).
ś 36 The second step is to determine "`whether the provision in question extends greater protections for the citizens of this state.'" Madison, 161 Wash.2d at 93, 163 P.3d 757 (quoting McKinney, 148 Wash.2d at 26, 60 P.3d 46). This step focuses on the state constitutional provision as applied to the alleged right in a particular context. Id. at 93-94, 163 P.3d 757. Thus, the pivotal question is whether article I, section 7 provides greater protection than the federal constitution in the context of smoking inside a private facility.
ś 37 Whether article I, section 7 provides enhanced protection depends on whether there has been an intrusion into a person's "private affairs." McKinney, 148 Wash.2d at 27, 60 P.3d 46. "Private affairs" are generally defined as "`those privacy interests which citizens of [Washington] have held, and should be entitled to hold, safe from governmental trespass.'" Id. (alteration in original) (quoting State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984)). Whether an intrusion into private affairs exists depends upon a two-step analysis: (1) what privacy interests citizens have historically held and (2) whether the expectation of privacy is one that citizens should be entitled to hold. Andersen, 158 Wash.2d at 44, 138 P.3d 963.
ś 38 The Post asserts that as a private facility it has a historical right to be free from government interference.[22] It argues that, historically, distinctly private clubs were protected from government interference in their private affairs. This claim is without merit. "[I]t is a universally sustained principle that persons within a state. . . hold their property and are entitled to enjoy and use it subject to a reasonable exercise of the police power . . . even though it affects adversely the property rights of some individuals." Ford v. Bellingham-Whatcom County Dist. Bd. of Health, 16 Wash.App. 709, 712, 558 P.2d 821 (1977); see also Bowes v. City of Aberdeen, 58 Wash. 535, 541-42, 109 P. 369 (1910) (noting the right to property is a legal right that must be *321 measured in reference to the rights of others and the public); Shepard v. City of Seattle, 59 Wash. 363, 375, 109 P. 1067 (1910) (noting the right to property is subject to a reasonable exercise of the state's police powers, including the preservation of health).
ś 39 Furthermore, contrary to the Post's assertions, government regulation of smoking and tobacco products is not a recent phenomenon and, as such, there is no traditional expectation of privacy in this context. States have regulated smoking since the 1800s. See C.L.A.S.H., 315 F.Supp.2d at 487 n. 20 (upholding the constitutionality of a statewide ban on the sale of cigarettes) (citing Austin v. State, 101 Tenn. 563, 48 S.W. 305, 309 (1898)); State v. Heidenhain, 42 La. Ann. 483, 485-86, 7 So. 621 (1890) (upholding a state criminal ordinance prohibiting smoking on street cars); Commonwealth v. Thompson, 53 Mass. 231, 232-33 (1847) (upholding a criminal statute prohibiting smoking on public streets in Boston). In 1900, the Supreme Court determined a state may completely prohibit cigarette sales without violating the Fourteenth Amendment. Austin v. Tennessee, 179 U.S. 343, 348-50, 21 S.Ct. 132, 45 L.Ed. 224 (1900). Today, "over 40 states have enacted laws restricting smoking in public places and approximately half of all the states have laws restricting smoking in private work locations." C.L.A.S.H., 315 F.Supp.2d at 489. In short, there is no historical privacy interest in smoking.
ś 40 The Post has not demonstrated that article I, section 7 provides greater protection in the context of smoking inside a private facility and, consequently, the Post's claim should be analyzed under the federal constitution's implicit right to privacy.[23] The federal constitution protects two types of privacy interests: the right to autonomous decision making (including issues relating to marriage, procreation, family relationships, child rearing, and education) and the right to confidentiality, or nondisclosure of personal information.[24]O'Hartigan v. Dep't of Pers., 118 Wash.2d 111, 117, 821 P.2d 44 (1991) (citing Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). The interest in autonomy is a recognized fundamental right, but the interest in confidentiality is not.[25]Id. The limits of the autonomy interest are circumscribed by the Supreme Court's fundamental rights jurisprudence. Bedford v. Sugarman, 112 Wash.2d 500, 513, 772 P.2d 486 (1989).
ś 41 Under the federal constitution, the existence of fundamental rights or liberties depends on whether they are "objectively, `deeply rooted in this Nation's history and tradition' and `implicit in the concept of ordered liberty,' such that `neither liberty nor justice would exist if they were sacrificed.'" Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997) (citation omitted) (quoting Moore v. City of E. Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion); Palko v. Connecticut, 302 U.S. 319, 325, 326, 58 S.Ct. 149, 82 L.Ed. 288 *322 (1937), overruled on other grounds, Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969)). "Fundamental liberty interests include the right to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." Andersen, 158 Wash.2d at 25, 138 P.3d 963 (citing Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258). A court should be reluctant to identify new fundamental rights because, in doing so, a matter is effectively placed "outside the arena of public debate and legislative action." Glucksberg, 521 U.S. at 720, 117 S.Ct. 2302.
ś 42 Smoking is not a fundamental right. See Batte-Holmgren v. Comm'r of Pub. Health, 281 Conn. 277, 295, 914 A.2d 996 (2007) (prohibition against smoking in restaurants and other public facilities does not implicate a fundamental right); Coal. for Equal Rights, Inc. v. Owens, 458 F.Supp.2d 1251, 1263 (D.Colo.2006) (right of bar owners to allow smoking in their establishments is not a fundamental right), aff'd, 517 F.3d 1195 (10th Cir.2008); Players, Inc. v. City of New York, 371 F.Supp.2d 522, 542 (S.D.N.Y.2005) (people do not have a fundamental right to smoke); Roark & Hardee LP v. City of Austin, 394 F.Supp.2d 911, 918 (W.D.Tex. 2005) ("it is clear that there is no constitutional right to smoke in a public place"); Fagan v. Axelrod, 146 Misc.2d 286, 297, 550 N.Y.S.2d 552 (Sup.Ct.1990) ("[t]here is no more a fundamental right to smoke cigarettes than there is to shoot up or snort heroin or cocaine or run a red light" (citation omitted)). Because there is not a fundamental right to smoke, there is no privacy interest in smoking in a private facility.
ś 43 The Post also asserts the Act violates a fundamental right to smoke in private facilities arising from the right of association. There are "two types of associational rights protected by the Constitution: the freedom of `expressive association' and freedom of `intimate association.'" City of Bremerton v. Widell, 146 Wash.2d 561, 575, 51 P.3d 733 (2002). Freedom of expressive association derives from the First Amendment and applies to government interference with speech, assembly, redress of grievances, and exercise of religion.[26]Roberts v. U.S. Jaycees, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Freedom of intimate association derives from the due process clause and principles of liberty and privacy. Id. Freedom of intimate association protects the "choices to enter into and maintain certain intimate human relationships." Id. at 617, 104 S.Ct. 3244. These relationships are protected because they "have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State." Id. at 618-19, 104 S.Ct. 3244. Such relationships are those "that attend the creation and sustenance of a family," including marriage, childbirth, the raising and education of children, and cohabitation with one's relatives. Id. at 619, 104 S.Ct. 3244.
ś 44 In determining whether a nonfamilial relationship qualifies as an intimate human relationship, courts consider a number of factors. A broad continuum of relationships exists and a court must look at the size, degree of selectivity in beginning and maintaining the group, and seclusion from others to determine whether the relationship qualifies as an intimate human relationship. Id.; Widell, 146 Wash.2d at 576-77, 51 P.3d 733. The Supreme Court determined the United States Jaycees was not an intimate human relationship because local chapters were large (400-430 people), not selective (membership was denied only on the basis of age or sex), and nonexclusive. U.S. Jaycees, 468 U.S. at 621-22, 104 S.Ct. 3244; see also Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 546, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987) (Rotary Club is not an intimate human relationship). Similarly, a thousand teenagers at a dance hall are not an intimate human relationship. City of Dallas v. Stanglin, 490 U.S. 19, 24, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989). This court has determined *323 an engaged couple who is not cohabitating does not qualify as an intimate human relationship. Widell, 146 Wash.2d at 577, 51 P.3d 733. While the possibility of a nonfamilial relationship qualifying as an intimate human relationship has not been foreclosed, this court has not expanded the right because it "stems from the right of privacy, which normally applies only to familial relationships and `extend[s] only so far as the principles of substantive due process permit.'" Id. (alteration in original) (quoting Bedford, 112 Wash.2d at 517, 772 P.2d 486).
ś 45 The Post does not specify which type of associational right it is relying on. Instead, it simply repeatedly asserts that the Act will interfere with its members' right of association.[27] Essentially, the Post seems to be arguing that as a social meeting place for veterans, the associations formed at the Post constitute intimate human relationships. The Post asserts one of its primary purposes is to provide a social atmosphere for its members and one of the essential attributes of this social atmosphere is smoking. Thus, the Post argues, a ban on smoking will impinge on these associations because the members, the majority of whom are smokers, will simply leave the Post and patronize tribal establishments, where smoking is allegedly allowed.
ś 46 Other courts have universally rejected challenges to smoking bans on the grounds they interfere with freedom of association. See, e.g., Players, 371 F.Supp.2d at 544-45 (rejecting social club's claim that a smoking ordinance violated freedom of association of intimate relationships); City of Tucson v. Grezaffi, 200 Ariz. 130, 136, 23 P.3d 675 (Ct.App.2001) (rejecting a restaurant owner's claim that a smoking ordinance violated freedom of association after analyzing both freedom of expressive association and freedom of association of intimate human relationships); Taverns for Tots, Inc. v. City of Toledo, 341 F.Supp.2d 844, 849-53 (N.D.Ohio 2004) (rejecting organization's claim that a smoking ban interfered with freedom of expressive association or freedom of association of intimate human relationships).
ś 47 In one case, a private social club for actors and members of the theatrical profession claimed a smoking ban violated its freedom of intimate association. Players, 371 F.Supp.2d at 525, 544-47. The club claimed that by joining, club members entered into intimate human relationships because it is "a relatively small, private, exclusive and secretive club." Id. at 544. The court rejected this claim, noting the club had 750 members and "would have a difficult time demonstrating that its members all share the `distinctively personal aspects' of their lives necessary for their rights of intimate association to be implicated by their membership in the organization." Id. at 544 n. 16. Even if the club were an intimate human relationship, the smoking ban only incidentally affected interaction among club members. Id. at 545. Although the club asserted that its mission was to promote social intercourse among its members, the court noted, "It is difficult to see how the social intercourse, and social intimacy, that the club seeks to facilitate could be unconstitutionally infringed merely because the meeting place provided by the club can no longer allow indoor smoking." Id.
ś 48 Similarly, the Post cannot show that its club, with 591 members, is an intimate association, though all of the members share the common characteristic of military service. Even if the Post were deemed to facilitate intimate human relationships, the ban does not directly interfere with such relationships or a person's ability to join the Post. Instead, it merely prohibits smoking in the Post's building when employees are present. Thus, the Post's claim that it has a fundamental *324 right to allow smoking under freedom of association must fail.
ś 49 Consequently, no fundamental rights are implicated in this case by prohibiting smoking in a private facility that is a place of employment. A law that does not interfere with fundamental rights and liberty interests is subject to rational basis review. Glucksberg, 521 U.S. at 728, 117 S.Ct. 2302. Rational basis review requires a law to be rationally related to a legitimate government interest. Id. The State has a legitimate interest in protecting public health. "`Regulating and restricting the use of private property in the interest of the public is [the state's] chief business.'" Manufactured Hous. Cmtys. of Wash. v. State, 142 Wash.2d 347, 355, 13 P.3d 183 (2000) (quoting Conger v. Pierce County, 116 Wash. 27, 36, 198 P. 377 (1921)). The purpose of the Act is to protect the health and welfare of all citizens, which is a legitimate government interest. RCW 70.160.011.
ś 50 Prohibiting smoking in places of employment is rationally related to protecting the public health. The hazardous nature of secondhand smoke is well known.[28]McCarthy v. Dep't of Soc. & Health Servs., 110 Wash.2d 812, 819, 759 P.2d 351 (1988) (holding an employer has a common law duty to provide a working environment reasonably free from tobacco smoke); see also Grezaffi, 200 Ariz. at 137, 23 P.3d 675; C.L.A.S.H., 315 F.Supp.2d at 486-89 (setting out the evolution of smoking research and regulation); Fagan, 146 Misc.2d at 293-95, 550 N.Y.S.2d 552 (noting the weight of scientific evidence overwhelmingly supports the assertion that secondhand smoke is a significant health hazard to nonsmokers). "[A] person who smokes in an enclosed area endangers the health of nonsmokers in the area." McCarthy, 110 Wash.2d at 820, 759 P.2d 351. It was rational for the voters, acting as the legislature, to determine that prohibiting smoking in places of employment would protect workers from the dangers of secondhand smoke. Thus, the Act does not violate due process or article I, section 7 of the state constitution.

E. Whether the Act violates article I, section 12 of the Washington Constitution
ś 51 The Post contends the Act violates the state privileges and immunities clause and the federal equal protection clause. When presented with claims under both the state and federal constitutions, we review the state constitutional arguments first. State v. Reece, 110 Wash.2d 766, 770, 757 P.2d 947 (1988).
ś 52 As discussed previously, when considering whether the state constitution provides greater protection than the federal constitution, this court engages in a two-step inquiry. Madison, 161 Wash.2d at 93, 163 P.3d 757. First, the court must determine "whether `a provision of the state constitution should be given an interpretation independent from that given to the corresponding federal constitutional provision.'" Id. (quoting McKinney, 148 Wash.2d at 26, 60 P.3d 46). Normally, this first step involves an analysis of the six nonexclusive Gunwall factors. However, "[o]nce this court has established that a state constitutional provision warrants an analysis independent of a particular federal provision," a Gunwall analysis is unnecessary. Id. at 94, 163 P.3d 757. The privileges and immunities clause warrants a separate constitutional analysis. Id.
ś 53 The second step is to determine "`whether the provision in question extends greater protections for the citizens of this state.'" Id. at 93, 163 P.3d 757 (quoting McKinney, 148 Wash.2d at 26, 60 P.3d 46). This step focuses on the state constitutional provision as applied to the alleged right in a particular context. Id. at 93-94, 163 P.3d 757. The court should look at the language of the constitutional provision in question and *325 the historical context surrounding its adoption. Id. at 94, 163 P.3d 757.
ś 54 We must determine whether the right to smoke in a private facility is a privilege or immunity protected by article I, section 12 of the Washington Constitution.[29] The privileges and immunities clause is concerned both with "`avoiding favoritism'" and "`preventing discrimination,'" the latter being the primary purpose of the federal equal protection clause.[30]Andersen, 158 Wash.2d at 14, 138 P.3d 963 (quoting Grant County II, 150 Wash.2d at 808, 83 P.3d 419). A privilege is not necessarily created every time a statute allows a particular group to do or obtain something. Grant County II, 150 Wash.2d at 812-13, 83 P.3d 419. Instead, the terms "`privileges and immunities'"
"pertain alone to those fundamental rights which belong to the citizens of the state by reason of such citizenship. These terms. . . secure . . . the right to remove to and carry on business therein; the right, by usual modes, to acquire and hold property, and to protect and defend the same in the law; the rights to the usual remedies to collect debts, and to enforce other personal rights; and the right to be exempt, in property or persons, from taxes or burdens which the property or persons of citizens of some other state are exempt from."
Id. (quoting State v. Vance, 29 Wash. 435, 458, 70 P. 34 (1902)).
ś 55 The foundation of the Post's argument is that a privilege is created when smoking is allowed in one facility and prohibited in another. The privilege is, arguably, the fundamental right "to remove to and carry on business therein." Br. of Appellant at 21. The Post notes the privileges and immunities clause is violated if a statute treats two businesses that are selling the same product differently. See State v. W.W. Robinson Co., 84 Wash. 246, 249-50, 146 P. 628 (1915) (invalidating statute that exempted cereal and flour mills from act imposing onerous conditions on other similarly situated businesses). The Post asserts it is similarly situated to a hotel, where smoking is allowed in some rooms, because they are both "private facilities" and "places of employment."
ś 56 The Post misconstrues the meaning of a privilege. Our jurisprudence indicates that a "privilege" normally relates to an exemption from a regulatory law that has the effect of benefiting certain businesses at the expense of others. See Jonathan Thompson, The Washington Constitution's Prohibition on Special Privileges and Immunities: Real Bite for "Equal Protection" Review of Regulatory Legislation?, 69 TEMP. L.REV. 1247, 1268 (1996). For example, a municipal ordinance requiring licenses for nonresident photographers, but not residents, violated article I, section 12. Ralph v. City of Wenatchee, 34 Wash.2d 638, 641, 209 P.2d 270 (1949). The court also struck down another part of the same ordinance that effectively prohibited nonresidents from engaging in the photography business, noting the primary purpose of the law was to insulate local photographers from competition. Id. at 644, 209 P.2d 270. The court reasoned that when the State's police power is manipulated to serve private interests at the expense of the common good, such legislation must be condemned as unreasonable and unlawful. Id.
ś 57 Unlike the photographers in Ralph, the Act does not prevent any entity from engaging in business, which is a privilege for purposes of article I, section 12. Instead, the Act merely prohibits smoking within a place of employment. RCW 70.160.030. Smoking inside a place of employment is not a fundamental right of citizenship and, therefore, is *326 not a privilege. Because there is no privilege involved, we hold there is no violation of article I, section 12. See Grant County II, 150 Wash.2d at 812, 83 P.3d 419.

F. Whether the Act violates the equal protection clause of the United States Constitution
ś 58 Equal protection under the law is required by both the Fourteenth Amendment to the United States Constitution and article I, section 12 of the Washington Constitution. O'Hartigan, 118 Wash.2d at 121, 821 P.2d 44. Equal protection requires that "`all persons similarly situated should be treated alike.'" Id. (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). The equal protection clause is aimed at "securing equality of treatment by prohibiting hostile discrimination." Andersen, 158 Wash.2d at 15, 138 P.3d 963. Under the equal protection clause, the appropriate level of scrutiny depends on the nature of the classification or rights involved. Id. at 18, 138 P.3d 963. Suspect classifications are subject to strict scrutiny. Id. at 19, 138 P.3d 963 (citing City of Cleburne, 473 U.S. at 440, 105 S.Ct. 3249). Race, alienage, and national origin are examples of suspect classifications.[31]Id. Strict scrutiny also applies to laws burdening fundamental rights or liberties. Id. at 24, 138 P.3d 963. Intermediate scrutiny applies only "`if the statute implicates both an important right and a semi-suspect class not accountable for its status.'" Madison, 161 Wash.2d at 103, 163 P.3d 757 (quoting In re Pers. Restraint of Runyan, 121 Wash.2d 432, 448, 853 P.2d 424 (1993)). The Post does not argue smokers or private facilities constitute suspect classes, and we already determined no fundamental rights are involved.
ś 59 If a suspect classification or fundamental right is not involved, rational basis review applies. Andersen, 158 Wash.2d at 18, 138 P.3d 963. A classification passes rational basis review "`so long as it bears a rational relation to some legitimate end.'" Id. at 23, 138 P.3d 963 (quoting Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)). Social and economic legislation that does not implicate a suspect class or fundamental right is presumed to be rational; this presumption may be overcome by a clear showing that the law is arbitrary and irrational. Hodel v. Indiana, 452 U.S. 314, 331-32, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981). "A legislative distinction will withstand a minimum scrutiny analysis if, first, all members of the class are treated alike; second, there is a rational basis for treating differently those within and without the class; and third, the classification is rationally related to the purpose of the legislation." O'Hartigan, 118 Wash.2d at 122, 821 P.2d 44. In reviewing the statute, "the court may assume the existence of any conceivable state of facts that could provide a rational basis for the classification." Andersen, 158 Wash.2d at 31, 138 P.3d 963. The classification need not be made with "`mathematical nicety,'" and its application may "`result[ ] in some inequality.'" Id. at 32, 138 P.3d 963 (internal quotation marks omitted) (quoting Heller v. Doe, 509 U.S. 312, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). "`It is no requirement of equal protection that all evils of the same genus be eradicated or none at all.'" O'Hartigan, 118 Wash.2d at 124, 821 P.2d 44 (quoting Ry. Express Agency, Inc. v. New York, 336 U.S. 106, 110, 69 S.Ct. 463, 93 L.Ed. 533 (1949)).
ś 60 In a recent case, an association of businesses argued Colorado's smoking ban violated the equal protection clause because smoking was banned in businesses such as bars and bingo halls, but allowed in casinos. Coal. for Equal Rights, 458 F.Supp.2d at 1257-61. The association argued the exceptions for casinos and airport smoking lounges were not rationally related to the smoking ban's articulated purpose. Id. at 1259. The court rejected this claim, noting it is the province of the legislature to make such classifications and such a classification must be upheld as long as there is "`any reasonably *327 conceivable state of facts that could provide a rational basis for the classification.'" Id. at 1260 (quoting Heller, 509 U.S. at 320, 113 S.Ct. 2637). Furthermore, although the association argued casinos were exempted solely for financial reasons, there was no support for the proposition that the state could not consider the fiscal impact of legislation under rational basis review. Id.
ś 61 Like the association in Coalition for Equal Rights, the Post argues the smoking ban exemption for hotel rooms is based upon economic concerns.[32] The Post argues prohibiting smoking in some private facilities that are places of employment, such as the Post, while allowing smoking in hotel rooms is discriminatory treatment. The Post argues this treatment is irrational because it is based upon economic concerns. However, the cases cited by the Post do not support its assertion that the legislature may not consider factors other than public health in determining where smoking should be banned.[33]
ś 62 The Post's claim must fail because it has not established it is treated differently than a similarly situated entity in its class. The Post fails to offer any evidence that hotels are being treated differently than the Post. The Post produced a document from the DOH entitled "More Frequently Asked Questions" from December 2005 opining that smoking is allowed in up to 25 percent of hotel rooms. CP at 126-27. This opinion is not evidence of discriminatory treatment.
ś 63 Even if discriminatory treatment existed, the legislative distinctions are rational. First, all private facilities that are places of employment are treated the same. The Post is not similarly situated to a hotel because it is not in the business of providing sleeping quarters. Second, there is a rational basis for treating hotels differently than private facilities. For example, the legislature could have determined hotel employees have limited access to the rooms while guests are present, whereas employees at facilities such as the Post may be required to spend their entire work shift in secondhand smoke. This conceivable argument serves as a rational basis for treating the two facilities differently and it is rationally related to the purpose of the Act, which is to protect employees from secondhand smoke in their workplaces.

G. Whether the Act is void for vagueness under the due process clauses of the Washington Constitution and the United States Constitution
ś 64 The Post's final argument is the Act violates the void-for-vagueness doctrine embodied in the due process clause. Under this doctrine, "`a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'"[34]U.S. Jaycees, *328 468 U.S. at 629, 104 S.Ct. 3244 (alteration in original) (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)).
ś 65 The first step in analyzing a vagueness challenge is to determine whether the challenge to the statute in question is to the face of the statute or as applied in a particular case. City of Spokane v. Douglass, 115 Wash.2d 171, 181-82, 795 P.2d 693 (1990). A vagueness challenge to a statute that does not implicate First Amendment rights must be considered in light of the facts of the specific case before the court. Vill. of Hofman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); Douglass, 115 Wash.2d at 182, 795 P.2d 693. Thus, a statute must be "tested for unconstitutional vagueness by inspecting the actual conduct of the party who challenges the ordinance and not by examining hypothetical situations at the periphery of the [statute's] scope." Douglass, 115 Wash.2d at 182-83, 795 P.2d 693.
ś 66 Due process does not require "impossible standards of specificity or absolute agreement." Id. at 179, 795 P.2d 693. Vagueness is not simply uncertainty as to the meaning of a statute. Id. In determining whether a statute is sufficiently definite, the provision in question must be considered within the context of the entire enactment and the language used must be "afforded a sensible, meaningful, and practical interpretation." Id. at 180, 795 P.2d 693. A court should not invalidate a statute simply because it could have been drafted with greater precision. Id. at 179, 795 P.2d 693.
ś 67 The Post argues the Act is void for vagueness because an ordinary person cannot understand whether smoking is proscribed in private, nonprofit fraternal clubs. The Act specifically exempts "private . . . workplace[s], within a public place" under RCW 70.160.060. The Post argues an ordinary person would not understand, in light of RCW 70.160.060, that smoking is banned in places of employment within private facilities. Furthermore, the Post argues, the definition of "place of employment" is vague as to which "private facilities" are exempt. The Post relies on a case where part of a smoking ban was struck down as being void for vagueness because it failed to adequately define "smoking paraphernalia." Lexington Fayette County Food & Beverage Ass'n v. Lexington-Fayette Urban County Gov't, 131 S.W.3d 745, 756 (Ky.2004). But cf. Roark & Hardee, 394 F.Supp.2d at 916-18 (determining the terms "smoking" and "smoking accessory" are not unconstitutionally vague); Taverns for Tots, 341 F.Supp.2d at 849-53 (finding a smoking ban exemption for a "private social function" was not unconstitutionally vague); Coal. for Equal Rights, 458 F.Supp.2d at 1262 (finding a smoking ban exception for small employers was not unconstitutionally vague).
ś 68 The Act clearly prohibits smoking "in a public place or in any place of employment." RCW 70.160.030. An ordinary person would understand that if an area constitutes a "place of employment," smoking is prohibited. The phrase "place of employment" clearly applies to the Post because it is an area under the control of a private employer which employees are required to pass through during the course of employment. RCW 70.160.020(3). The Post concedes it is an employer, it has employees, and the employees are required to work in the lounge. Thus, an ordinary person would believe smoking is prohibited at the Post. The Post's argument centers on the exceptions for private facilities and privately enclosed workplaces within public places. Although the interplay between these exceptions and their application in other situations (such as hotel rooms) may not be entirely clear, these matters are not before the court because the Post is asserting only an as-applied vagueness challenge. The Act is sufficiently definite to overcome the Post's void-for-vagueness challenge.

H. Whether any party is entitled to attorney fees
ś 69 Attorney fees and expenses are available on appeal if provided by law. RAP *329 18.1(a). The Post requests attorney fees pursuant to 42 U.S.C. § 1988. Attorney fees may be available under 42 U.S.C. § 1988 when a plaintiff brings a lawsuit under 42 U.S.C. § 1983 to redress a violation of a person's constitutional rights. 42 U.S.C. § 1988. The Post did not file a § 1983 claim and is not entitled to attorney fees under § 1988.
ś 70 Both KCHD and DOH request statutory attorney fees and costs pursuant to RCW 4.84.030. A prevailing party is entitled to costs and disbursements in any action in superior court. RCW 4.84.030. Costs include statutory attorney fees. RCW 4.84.010(6). KCHD and DOH are prevailing parties, so they are awarded costs, including statutory attorney fees.

IV. CONCLUSION
ś 71 We affirm the trial court. The Act clearly prohibits smoking in any "place of employment," the Post is a "place of employment," and none of the exceptions in question apply to places of employment. Furthermore, we affirm the trial court's ruling that the Post does not have representational standing and, as such, decline to address whether the Act violates the constitutional rights of the Post's members. As to the other constitutional claims, we hold the Act does not violate article I, section 7 of the Washington Constitution; article I, section 12 of the Washington Constitution; equal protection; or due process. KCHD and DOH are the prevailing parties and are entitled to costs, including statutory attorney fees.
WE CONCUR: GERRY L. ALEXANDER, C.J., BARBARA A. MADSEN, SUSAN OWENS, JJ., BOBBE J. BRIDGE, Justice Pro Tem.
MADSEN, J. (concurring).
ś 72 I agree with the majority opinion and write separately only because I do not want the obvious to be lost: RCW 70.160.030 prohibits smoking "in a public place or in any place of employment." (Emphasis added.) The dissenters say that "private facilities" are excluded from the law, regardless of whether people are employed within the facility. If they are correct, then, as the majority points out, an office building that is not open to the public, i.e., a "private facility," will be excluded from the ban, despite the fact that the building may house hundreds of employees. This defies the "common sense" which the dissenters so liberally call upon, as well as the plain reading of the statute. "Our job," is not, as Justice Johnson says, "to apply the law as the average informed voter understood the exemption in RCW 70.160.020(2)"â "our job" is to apply the law as it is written, respecting the right of the people to speak through the initiative process, regardless of our personal preferences. Dissent (J.M. Johnson, J.) at 341.
SANDERS, J. (dissenting).
ś 73 In 1985 the legislature adopted the clean indoor air act, which limited smoking in some but not all public places. Laws of 1985, ch. 236. American Legion Post # 149 (the Post Home), a private member-run organization whose membership is limited to those who served in the military or Merchant Marines during a time of armed conflict, was clearly exempt. However in 2006, Initiative 901, the smoking in public places act (the Act), amended the clean indoor air act, extending the smoking ban to places of employment. The question is whether the Act prohibits smoking at the Post Home and, if so, is the Act constitutional. The majority answers both questions in the affirmative. I disagree.
ś 74 The first question is one of statutory interpretation wherein our inquiry is to ascertain the voters' intent based on the language of the initiative as an average informed layperson would read it. In re Estate of Hitchman, 100 Wash.2d 464, 467, 670 P.2d 655 (1983) (citing Dep't of Revenue v. Hoppe, 82 Wash.2d 549, 555, 512 P.2d 1094 (1973)). The second question is purely one of law wherein our inquiry is whether the Act violates the constitution. Such a question of law is properly reviewed de novo. See, e.g., In re Parentage of C.A.M.A., 154 Wash.2d 52, 57, 109 P.3d 405 (2005) ("The interpretation of a statute and the determination of whether a statute violates the United States Constitution are issues *330 of law that are reviewed de novo.") (citing Cockle v. Dep't of Labor & Indus., 142 Wash.2d 801, 807, 16 P.3d 583 (2001); State v. Blilie, 132 Wash.2d 484, 489, 939 P.2d 691 (1997)).[1]

To Avoid Constitutional Infirmity the Act Exempts the Post Home
ś 75 "[W]here a statute is susceptible of several interpretations, some of which may render it unconstitutional, the court, without doing violence to the legislative purpose, will adopt a construction which will sustain its constitutionality if at all possible to do so." State ex rel. Morgan v. Kinnear, 80 Wash.2d 400, 402, 494 P.2d 1362 (1972).
ś 76 The Act prohibits smoking "in a public place or in any place of employment." RCW 70.160.030. However, the Act "is not intended to restrict smoking in private facilities. . . ." RCW 70.160.020(2). Moreover, the Act permits "smoking in a private enclosed workplace, within a public place, even though such workplace may be visited by nonsmokers. . . ." RCW 70.160.060. To read this language as a layperson would read it, the Act exempts the Post Home.
ś 77 The majority perceives exempting the Post Home is inconsistent with the statutory scheme and the intent of the voters. I disagree. To interpret the statute any other way is not only to ignore the text and intent of the voters but also to invite constitutional error.
ś 78 "`In construing the meaning of an initiative, the language of the enactment is to be read as the average informed lay voter would read it.'" Majority at 313-14 (internal quotation marks omitted) (quoting State v. Brown, 139 Wash.2d 20, 28, 983 P.2d 608 (1999)). The Act does not define "private facility" or "private enclosed workplace." However, "private" means "intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public."[2] A "facility" is "something. . . that is built, constructed, installed, or established to perform some particular function or to serve some particular end."[3] A "workplace" is "a place . . . where work is done."[4]
ś 79 The Post Home is clearly "private." Its membership is restricted to those persons who have served this country at a time of armed conflict, and its employees are "directly related to either current members . . . or deceased veterans who, if they were alive, would be entitled to membership." Majority at 313 n. 2. Moreover, the Post Home is a "facility" established for the particular function of facilitating the gathering of those persons who have served this country in a time of war. The exception of RCW 70.160.020(2) applies to the Post Home.
ś 80 The majority reasons that applying the exception to the Post Home would swallow the smoking restriction at places of employment, analogizing to an office building with hundreds of employees. Majority at 316-17; see also concurrence at 329. But its analogy is inapt; an office building is not restricted to a particular group or class of *331 persons.[5] Post Home, however, as a private association may be and in fact is restrictive in its membership and employment. See Boy Scouts of Am. v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000); see also RCW 49.60.040(3) (excluding "any religious or sectarian organization not organized for private profit" from discrimination laws).
ś 81 Nor can it be said the "private facility" exemption frustrates the voters' intention. Initiative 901 amended RCW 70.160.020(2) to include certain places of employment with the "public place" definition while leaving intact the "private facility" exception. See RCW 70.160.020(2) (banning smoking from "bars, taverns, bowling alleys, skating rinks, casinos[;] . . . [t]his chapter is not intended to restrict smoking in private facilities"). When enlarging the smoking ban to include these places of employment, the voters left intact this very specific "private facility" exemption. Moreover, the voters left intact the exemption for smoking in "private enclosed workplaces, within a public place. . . ." RCW 70.160.060.
ś 82 These exceptions to the smoking ban express the voters' recognition that certain private places, even if places of employment, are exempt from the smoking ban. We must recognize these specific exemptions, not replace them with our own.[6]See In re Estate of Little, 106 Wash.2d 269, 283, 721 P.2d 950 (1986) (giving effect to specific statute over general one).
ś 83 Nor do these specific exemptions conflict with the voters' intent to protect employees from secondhand smoke for two reasons. First, the stated intention of Initiative 901 was "to prohibit smoking in public places and workplaces." RCW 70.160.011 (emphasis added). In this context the word "and" is conjunctive, joining the two elements "so that the second logically qualifies the first. . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 80 (2002). In other words, the voters' intention was to restrict smoking from places of employment that were also public places.
ś 84 Second, a "private facility" and "private enclosed workplace" are, by definition, limited to particular places available to a particular class of people, the class of people who make it private. Employment at a "private facility," available only to members of the organization, is not employment in the usual sense of the term; employment is restricted to members of the particular class to make the "private facility" private in the first place.[7] At the Post Home a person is a member first, an employee second. If a private member-run association may restrict employment to only its voluntary members, it is a "private facility" and exempt from the smoking ban. This is a much narrower exception than the one conceived by the majority and concurrence.
ś 85 All seven employees of the Post Home are members of its auxiliary. "Membership in the Auxiliary is limited to women who are directly related to either current members of the American Legion or deceased veterans who, if they were alive, would be entitled to membership." Majority at 313 n. 2. All seven Post Home employees are directly related to other members of the Post Home. It is ironic a member may smoke with his wife at home but not at the Post Home because at the Post Home his wife is being remunerated for her time. It is equally ironic that six out of seven of the auxiliary members employed at the Post Home are themselves smokers.[8]
ś 86 The "private facility" exception reflects the greater importance of private autonomy *332 over business relationships. Otherwise, what public purpose does the Act serve beyond pernicious interference with personal liberty?
ś 87 According to the majority, to permit smoking at the Post Home would "involuntarily subject[ ]" employees to the supposed dangers of workplace smoke. Majority at 316-17. Our majority forgets we purport to live in a free society; this is neither the "Soviet of Washington"[9] nor Nazi Germany.
ś 88[10] Slavery was abolished in 1865.[11] Moreover, since Washington is an "at will" employment state, either the employer or the employee can end the employment relationship at any time, with or without notice and with or without cause. See, e.g., Lasser v. Grunbaum Bros. Furniture Co., 46 Wash.2d 408, 410, 281 P.2d 832 (1955). Since none of the Post Home's employees are involuntary, none of them are "involuntarily subjected" to anything. Majority at 316-17.

The Act Is Void for Vagueness
ś 89 A vague statute violates the "basic principle of due process" contained in the Fourteenth Amendment to the United States Constitution[12] if it fails to (1) provide fair notice of the proscribed conduct or (2) provide clear standards. Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).
Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.
Id. at 108-09, 92 S.Ct. 2294 (footnotes omitted); see also State v. Williams, 144 Wash.2d 197, 203, 26 P.3d 890 (2001).
ś 90 The Post Home contends the Act violates the first aspect of the vagueness test. It argues the Act's definition of "place of employment" is vague as to what "private facilities" are exempt.
ś 91 The majority asserts the statute is not vague because no "private facility" is exempt from the prohibition on smoking in places of employment. That is simply not true. Smoking is permitted in "a private enclosed workplace, within a public place, even though such workplace may be visited by nonsmokers. . . ." RCW 70.160.060. As the trial judge noted, "I'm not sure what that means, because in my interpretation of what's been done here, if that so-called private workplace had employees, then this law covers them. So how do you have a private workplace without employees?" Report of Proceedings at 40. If a learned trial judge is unable to make heads or tails out of the Act, how is "a person of ordinary intelligence" expected to be able to "steer between lawful and unlawful conduct"? Grayned, 408 U.S. at 108, 92 S.Ct. 2294.
ś 92 The majority all but concedes the point, but dodges the issue "because the Post is asserting only an as-applied vagueness *333 challenge." Majority at 328.[13] According to the majority "the interplay between these exceptions ["private facility" and "private workplace within a public place"] and their application in other situations (such as hotel rooms) . . . are not before the court. . . ." Id.
ś 93 I agree with the majority insofar as we are not discussing hotel rooms. However, that does not answer the question of whether a reasonable person would understand the Act prohibits smoking at the Post Home or other private member-run organizations with member-employees. The Act prohibits smoking at places of employment but permits smoking at private facilities and "private enclosed workplace[s], within a public place." RCW 70.160.060.
ś 94 I agree with the trial judge; I am not sure what this means or how it applies (or perhaps not applies) to the Post Home. As such, the statute is vague.

The Act Violates the Post Home's Right of Intimate Association[14]
ś 95 The United States Supreme Court has recognized the fundamental right to enter into and carry on certain intimate associations absent government intrusion. Roberts v. U.S. Jaycees, 468 U.S. 609, 617, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) observed "two distinct" aspects of the freedom to associate. In the first line of cases, "the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendmentâ speech, assembly, petition for the redress of grievances, and the exercise of religion." Id. at 618, 104 S.Ct. 3244. In the second line of cases, however, "the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." Id. at 617-18, 104 S.Ct. 3244. In this second category of decisions, "freedom of association receives protection as a fundamental element of personal liberty" under the due process clause of the Fourteenth Amendment. Id. at 618, 104 S.Ct. 3244. We find ourselves in this second line.
ś 96 Every case cited by the majority addressed the issue under the general social associative rights of the First Amendment, not the specific intimate associative rights of the Fourteenth Amendment, a critical distinction. See majority at 322-23 (citing City of Tuscon v. Grezaffi, 200 Ariz. 130, 136, 23 P.3d 675 (Ct.App.2001) (dismissing a challenge based on "`generalized right of social association under the First Amendment'" (quoting Kahn v. Thompson, 185 Ariz. 408, 414, 916 P.2d 1124 (Ct.App.1995)))); NYC C.L.A.S.H., Inc. v. City of New York, 315 F.Supp.2d 461, 472 (S.D.N.Y.2004) ("CLASH does not suggest that the gathering of individuals in bars and restaurants to engage in social or even business activities while smoking is the type of `intimate' relationships that the Supreme Court contemplated in Roberts.. . ."); Taverns for Tots, Inc. v. City of Toledo, 341 F.Supp.2d 844, 850-51 (N.D.Ohio 2004) (dismissing the intimate association claim and focusing instead on the First Amendment right of association); Players, Inc. v. City of New York, 371 F.Supp.2d 522, 545 (S.D.N.Y.2005) (analyzing the claim as one under the First Amendment). Therefore, to the extent these cases discuss or analyze an inapposite right, they are not applicable to the resolution of the issue here.
ś 97 "Intimate associations" are those that include "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community *334 of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." Roberts, 468 U.S. at 620, 104 S.Ct. 3244; see also City of Bremerton v. Widell, 146 Wash.2d 561, 576-77, 51 P.3d 733 (2002). This court has "decline[d] to hold that the right of intimate association is limited solely to familial relationships." Id. at 577, 51 P.3d 733; see also Bd. of Dirs. of Rotary Int'l, 481 U.S. at 545-46, 107 S.Ct. 1940. "In determining whether a particular association is sufficiently personal or private to warrant constitutional protection, we consider factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." Id. at 546, 107 S.Ct. 1940 (citing Roberts, 468 U.S. at 620, 104 S.Ct. 3244).
ś 98 The question of whether the Post Home is an intimate association cannot be seriously debated. Membership in the Post Home is limited to veterans and Merchant Marines who served this nation during times of armed conflict. For centuries the brotherhood of soldiers has been recognized:
We few, we happy few, we band of brothers; For he to-day that sheds his blood with me Shall be my brother. Be he ne'er so vile, This day shall gentle his condition; And gentlemen in England now abed Shall think themselves accurs'd they were not here, And hold their manhoods cheap whiles any speaks That fought with us upon Saint Crispin's Day.[[15]]
This brotherhood is forged in battle, tempered by that common experience, and shaped by the mutual empathy of life afterward. Those who have not experienced armed conflict ought to be the first to recognize the intimacy created by that unique experience, not contest its existence.[16]
ś 99 Once properly recognized, the question becomes whether the smoking ban represents an "undue intrusion by the State. . . ." Roberts, 468 U.S. at 618, 104 S.Ct. 3244. In the context of the familial relationship, an "undue intrusion" exists when the State imposes itself into the decision making process of the family, including the decision of whether to become a family. Id. at 619-20, 104 S.Ct. 3244 (citing cases).
ś 100 To pick up this analytical cue, the question becomes whether the smoking ban is an imposition into the decision making process of the Post Home or its members, including the decision to enter into or maintain a relationship with the Post Home.
ś 101 According to the majority, "`it is difficult to see how the social intercourse, and social intimacy, that the club seeks to facilitate could be unconstitutionally infringed merely because the meeting place provided by the club can no longer allow indoor smoking.'" Majority at 323 (quoting Players, 371 F.Supp.2d at 545).
ś 102 Yet if smoking were banned at the Post Home, its members "would feel forced to eliminate or severely curtail their use of. . . the Post Home. . . . If smoking was banned, the Post would lose members who would go elsewhere. . . ." Clerk's Papers (CP) at 105 (Decl. of Robert Kucenski). Even deployed together. It is not the common enemy that binds these veterans in brotherhood but the common experience. The bullets may be European, Asian, or Middle Eastern, but the intimacy is universal. the State agrees the smoking ban may influence members of the Post Home to disperse and go elsewhere. Br. of Resp't at 15. Moreover, it is reasonable to infer the smoking ban may influence a potential member's choice to join the Post Home.[17] Acknowledging all the parties understand how the smoking ban influences the members and potential members of the Post Home, the difficulty of the majority to see how the smoking ban infringes the right of intimate association is irrelevant to all but the majority and its preferred result.
*335 ś 103 When the State imposes itself into the decision making process of the members or potential members of the Post Home, the State unduly intrudes into the Post Home's right of intimate association. I would hold the Act invalid as applied. However, the Act is also invalid as a deprivation of substantive due process.

The Act Violates Due Process
ś 104 All regulations and laws enacted pursuant to the State's police power are subject to the due process clause of the Fourteenth Amendment to the United States Constitution. See, e.g., Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894); see also County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (stating due process is intended to protect the individual against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective").
ś 105 To satisfy due process, the law or regulation must (1) be aimed at achieving a legitimate public purpose, (2) use means that are reasonably necessary to achieve that purpose, and (3) not be unduly oppressive on individuals. Goldblatt v. Town of Hempstead, 369 U.S. 590, 594-95, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (citing Lawton, 152 U.S at 137, 14 S.Ct. 499). "The classic statement of the rule in Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385 (1894), is still valid today." Goldblatt, 369 U.S. at 594, 82 S.Ct. 987; see also Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 541-42, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) (observing the Lawton due process inquiry asks "whether a regulation of private property is effective in achieving some legitimate public purpose[ ] . . ., for a regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause.").
ś 106 Undoubtedly the smoking ban regulates private property. See majority at 320. But more fundamentally the smoking ban prohibits private conduct. It is this regulation of private conduct I find most disturbing.
ś 107 "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter. We have vindicated this principle before." Planned Parenthood v. Casey, 505 U.S. 833, 847, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion).
ś 108 In Meyer v. Nebraska, 262 U.S. 390, 396-97, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), a teacher was tried and convicted of teaching a 10-year-old the German language, contravening a statute that made it verboten to teach German. Reversing the conviction the United States Supreme Court held,
[liberty] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.
Id. at 399, 43 S.Ct. 625 (citing cases).
ś 109 Similarly in Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925), an Oregon statute required students attend public school only. The Court held Oregon had a legitimate interest to regulate schools, teachers, and curriculum and to require all children of a certain age attend school; however, to compel attendance at public school, the State "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." Id. at 534-35, 45 S.Ct. 571.
ś 110 These cases should not be dismissed as judicial aggression toward governmental overreaching into the familial sphere under the guise of police power. As recently as 2003 the United States Supreme Court recognized the promise that
[l]iberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home. And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant *336 presence. Freedom extends beyond spatial bounds. Liberty presumes an autonomy of self. . . .
Lawrence v. Texas, 539 U.S. 558, 562, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (emphasis added); see also Roe v. Wade, 410 U.S. 113, 152-53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (banning abortion violates substantive due process). I seriously doubt the State's health interest to protect against sexually transmitted disease, a real and verifiable concern, could constitutionally justify invading the privacy of consenting adults.
ś 111 This self-autonomy includes what time you go to bed at night, how much to exercise, how much fat to eat, a choice to smoke, a choice to be around smokers as well as every other myriad private decision we make to pursue happiness in our lives (even when some choices are probably not as healthy as others). Yet these choices are the very essence of personal liberty and self-autonomy.[18] Most of us would pause if the State compelled our bedtime based on a perception that many Washingtonians are sleepless in Seattle. Hopefully in our free society the coercive power of the State is restricted from this realm.
If . . . a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution"
Mugler v. Kansas, 123 U.S. 623, 661, 8 S.Ct. 273, 31 L.Ed. 205 (1887); see also Biggers v. City of Bainbridge Island, 162 Wash.2d 683, 694, 169 P.3d 14 (2007).
ś 112 The State imposes its coercive power on the members of the Post Home, not because there are people at the Post Home who do not want to be around smokers, but quite the contrary. Every member of the Post Home would prefer smoking be permitted at the Post Home, including the seven members who are also employees. Rather, the State imposes its coercive power on the Post Home notwithstanding the desire of those locked behind its private doors to prevent outside intrusion.
ś 113 According to the majority, the Act is premised on the claim that banning smoking in the Post Home is necessary to ensure the health and safety of the Post Home's seven member-employees. However, it is inherently a factual question whether the legitimate end of ensuring employees are safe from workplace dangers is advanced by banning workplace smoking. But the State submits no such facts in its affidavit to support such a proposition; it merely cites a widely discredited federal report to support its claim. See Thomas A. Lambert, The Case Against Smoking Bans, 13 Mo. ENVTL. L. & POL'Y REV. 94, 109-111 (2006).
ś 114 The focus on secondhand smoke as an alleged workplace danger began in 1993 with the classification by the Environmental Protection Agency (EPA) of secondhand smoke as a Class A carcinogen, supposedly causing an approximate 3,000 deaths of nonsmoking adults per year.[19] Shortly after the EPA released its report, a congressional inquiry found "the Agency has deliberately abused and manipulated the scientific data in order to reach a predetermined, politically motivated result. . . . [The] EPA was able to reach that conclusion only by ignoring or discounting major studies and by deviating from generally accepted scientific standards."[20]
*337 ś 115 Courts have also questioned the EPA's conclusion secondhand smoke presents a danger in the workplace. "The court is faced with the ugly possibility that EPA adopted a methodology for each chapter, without explanation, based on the outcome sought in that chapter." Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. Envtl. Prot. Agency, 4 F.Supp.2d 435, 456 (M.D.N.C.1998), vacated on other grounds, 313 F.3d 852 (4th Cir.2002). That court, unlike our own, was more concerned with finding the Truth than merely identifying and upholding government policy. The court concluded:
EPA publicly committed to a conclusion before research had begun; . . . adjusted established procedure and scientific norms to validate the Agency's public conclusion, and aggressively utilized the Act's authority to disseminate findings to establish a de facto regulatory scheme intended to restrict [tobacco] products and to influence public opinion. . . . EPA disregarded information and made findings on selective information; did not disseminate significant epidemiologic information; deviated from its Risk Assessment Guidelines; failed to disclose important findings and reasoning; and left significant questions without answers.. . . While so doing, EPA produced limited evidence, then claimed the weight of the Agency's research evidence demonstrated ETS [environmental tobacco smoke] causes cancer.
Id. at 465-66 (footnote omitted).
ś 116 Subsequent studies confirm these criticisms to question the supposed connection between cancer and secondhand smoke.[21] A respected study, primarily funded by the American Cancer Society, of more than 35,000 nonsmoking Californians married to smokers concluded, "[t]he results do not support a causal relation between environmental tobacco smoke and tobacco related mortality, although they do not rule out a small effect. The association between exposure to environmental tobacco smoke and coronary heart disease and lung cancer may be considerably weaker than generally believed."[22]
ś 117 These criticisms of the dangers of secondhand smoke have not gone unnoticed. Smoking ban proponents often answer these criticisms not with contradictory scientific data but with ad hominem attacks on the scientists themselves.[23]
ś 118 As a famous lawyer once asked, "What is to be done?"[24]
ś 119 Recall the three-prong test that must be satisfied before the State may regulate private property or prohibit private lawful conduct. Under the first prong we ask if there is a legitimate public purpose for the action. The stated purpose of the smoking ban is workplace safety:
The people of the state of Washington recognize that exposure to second-hand smoke is known to cause cancer in humans. Secondhand smoke is a known cause of other diseases including pneumonia, asthma, bronchitis, and heart disease. Citizens are often exposed to second-hand smoke in the workplace, and are likely to develop chronic, potentially fatal diseases as a result of such exposure. In order to protect the health and welfare of all citizens, including workers in their places of employment, *338 it is necessary to prohibit smoking in public places and workplaces.
RCW 70.160.011 (emphasis added); see also CP at 227 (State's memorandum in support of its motion for summary judgment stating, "challenged laws cannot reasonably be characterized as anything other than police power legislation rationally related to protecting employees from the known health risks of secondhand smoke" (emphasis added)).
ś 120 I agree modern jurisprudence recognizes workplace safety as a legitimate public purpose. See, e.g., Parrish v. W. Coast Hotel Co., 185 Wash. 581, 55 P.2d 1083 (1936) (upholding a statute governing wages and working conditions of female and child laborers), aff'd, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). However, "`[w]hen our rulers worry about our health, we should worry about our liberty.'" Joseph Sobran, The Wanderer 5 (June 26, 1997), quoted in Seeley v. State, 132 Wash.2d 776, 814, 940 P.2d 604 (1997) (Sanders, J., dissenting).
ś 121 Under the second prong of the test, we look to the necessity of the action to achieve that legitimate public purpose. Absent a substantial relation to the achievement of the legitimate public purpose, the State may not regulate or prohibit the free conduct of its citizens. See Biggers, 162 Wash.2d at 694, 169 P.3d 14; see also Petstel, Inc. v. King County, 77 Wash.2d 144, 154, 459 P.2d 937 (1969) (stating, "even though the activity in question be subject to police power regulation, the legislation must be substantially related to the evil sought to be cured").
ś 122 As shown above whether secondhand smoke is the known cause of disease is far from self-evident for summary judgment purposes. Dr. Elizabeth Whelan, President of the American Council on Science and Health (and an antismoking advocate) observed, "the role of ETS [environmental tobacco smoke] in the development of chronic diseases like cancer and heart disease is uncertain and controversial."[25]
ś 123 If there is no proven causal relation between secondhand smoke and workplace dangers, the prohibition of smoking is arbitrary; arbitrary regulations violate due process.[26]See Lawton, 152 U.S. at 137, 14 S.Ct. 499 (stating a "legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations."). A mere possibility of harm is insufficient. See State ex rel. Wenatchee Congregation of Jehovah's Witnesses v. City of Wenatchee, 50 Wash.2d 378, 384, 312 P.2d 195 (1957). Even slight harm is equally insufficient. See Lambert, supra, at 111 ("[P]aternalistic regulations aimed solely at reducing risks . . . are justifiable only when the risk is relatively serious and the liberty intrusion occasioned by the regulation is relatively minor."). As succinctly stated by Dr. Michael Siegel, professor in the Social and Behavioral Sciences Department, Boston University School of Public Health and noted antismoking advocate, "The ends do not justify the means, especially when those means are violating principles of autonomy and self-determination that form the essential bases for free societies. These are values which cannot and should not be trodden upon by public health organizations simply to promote a favored policy."[27]
ś 124 I would hold the Act violates substantive due process absent proof, persuasive to the fact finder, that the stated reason for the Act is actually and substantially advanced by the implementation of the prohibition.[28] *339 This is not to require "undisputed" or "absolute" scientific proof, as the majority interprets, but instead merely to require the declared reason for the Act be actually and substantially advanced. Majority at 324 n. 28. Absent this minimal requirement, individuals hold their liberty in trust for the State to extinguish at its leisure.

The Act Violates the Post Home's Equal Protection Guaranty
ś 125 The majority recognizes the essence of the claimed equal protection violation by observing the Act excludes "`a private enclosed workplace, within a public place,'" but the Act "does not, by its terms, apply to private enclosed workplaces in private places," majority at 317-18 (quoting RCW 70.160.060). Yet the majority fails to address the clear equal protection violation obvious from its observation.[29]
ś 126 If the Act distinguishes between private enclosed workplaces in public places and private enclosed workplaces in private places, what is the reason to make this public/private distinction? If none, this public/private distinction is "`wholly irrelevant to achievement of legitimate state objectives.'" Heiskell, 129 Wash.2d at 124, 916 P.2d 366 (quoting State v. Shawn P., 122 Wash.2d 553, 561, 859 P.2d 1220 (1993)).
ś 127 Before analyzing the equal protection violation, let us revisit the majority's interpretation of RCW 70.160.060. The majority reasons RCW 70.160.060 permits smoking in a manager's back office. Majority at 318. This may be true, but RCW 70.160.060 is not so narrowly written as to apply only to back offices. RCW 70.160.060 permits smoking "in a private enclosed workplace, within a public place, even though such workplace may be visited by nonsmokers. . . ." "Workplace" is not defined in the statute, but commonly means "a place . . . where work is done."[30] Work is done by employees or employers.[31] Moreover, RCW 70.160.060 makes no distinction between an employee or nonemployee but permits smoking even though the "workplace" may be visited by "nonsmokers." The only restriction appears to be employees must not be "required to pass through during the course of employment.. . ." RCW 70.160.020(3).[32]
ś 128 The Act distinguishes between two classes of workplaces, permitting smoking in one workplace, but not another. The majority claims the Act permits smoking in "a private enclosed workplace, within a public place," but not in a private place. RCW 70.160.060 (emphasis added). I find this distinction perplexing.
ś 129 "`Under the rational basis test the court must determine: . . . whether there are reasonable grounds to distinguish between those within and those without the class. . . .'" Griffin v. Eller, 130 Wash.2d 58, 65, 922 P.2d 788 (1996) (quoting Convention Ctr. Coal. v. City of Seattle, 107 Wash.2d 370, 378-79, 730 P.2d 636 (1986)).
ś 130 The following hypothetical elucidates the equal protection violation. Suppose two taverns have a "private enclosed workplace" adjacent to the primary workplace. This "enclosed workplace" is "private" in the sense that it is completely separated from *340 the primary bar, work is performed there, and it is "intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public."[33] Now suppose the first bar is called "Moe's Tavern" and open to anyone, but the second is called "The American Legion Post Home" and only open to members. Smoking can occur at Moe's Tavern in its "private enclosed workplace" but it cannot occur at the American Legion Post Home in its "private enclosed workplace" simply because it is private? I can imagine no reason for this distinction, and I challenge the majority to posit one.

Conclusion
ś 131 For the reasons stated above, I would hold the Act does not apply to the Post Home as a private facility. Alternatively, if the Post Home's status as a private facility does not limit the Act's application, I would hold the Act is void for vagueness; unduly interferes with the Post Home's right of intimate association; violates the Post Home's substantive due process rights absent actual proof of a real and substantial relation between secondhand smoke and workplace dangers; and violates equal protection by distinguishing between two classes of business without reasonable grounds.
ś 132 I dissent.
J.M. JOHNSON, J. (dissenting).
ś 133 Washington has twice adopted smoking restrictions with a clear exemption for private facilities like the American Legion Post. "This chapter is not intended to restrict smoking in private facilities which are occasionally open to the public except upon the occasions when the facility is open to the public." RCW 70.160.020(2). "This chapter" is the "Smoking in Public Places Act" (Act). This language is clear and should be enforced by courts as understood by the voters.[1]
ś 134 Legislators who passed the original smoking law in 1985 knew of private organizations with their own private facilities like the American Legion, the Veterans of Foreign Wars, and numerous others, and included an exemption from the anti-smoking laws, without which the law may not have passed.
ś 135 Sponsors of Initiative 901 left this exemption in place, reflecting similar political considerations that an initiative campaign against smokers in bars is easy; one against private clubs like the Legionnaires is less likely to succeed. The job of the courts is to enforce this compromise, not to allow bureaucrats to extend the law beyond what was adopted through the democratic process. I respectfully dissent.
ś 136 The legislature first passed the Act as a whole in 1985, LAWS OF 1985, ch. 236, and Initiative 901 amended only parts. Originally, people were restricted from smoking in public places, and the legislature made clear that private facilities occasionally open to the publicâ the American Legion Post, for exampleâ were exempt. Initiative 901 added a provision forbidding smoking in places of employment. LAWS OF 2006, ch. 2, § 3; RCW 70.160.030. This initiative explicitly left the exemption in place; it remains in law and should be enforced by courts.
ś 137 The materials explaining Initiative 901 for voters made clear the private facility exemption would remain in force. The voters' pamphlet for initiatives provides the constitutionally required explanation of an initiative and its effects. WASH. CONST. art. II, § 1(e). The voters' pamphlet for Initiative 901 made no mention that it was making any change to the exemption for private facilities. Neither the attorney general's explanation of Initiative 901 nor the statements for and against in the voter's guide even mentioned this exemption. State of Washington Voters' Pamphlet, General Election 10-11 (Nov. 8, 2005). Without specifying amendments to a prior law, the law is not changed, provided it does not conflict with another law. In re *341 Det. of R.S., 124 Wash.2d 766, 774, 881 P.2d 972 (1994). This rule is based both on our constitution and on common sense.
ś 138 Washington Constitution article II, section 37 expressly requires, "No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length." Initiative 901 certainly set forth the law in full, but explicitly did not revise, but rather left the exemption in place. State of Washington Voters' Pamphlet, General Election 30 (Nov. 8, 2005).
ś 139 Further, the "no change without express reference" rule has a strong logical rationale behind it: most proposed changes in the law will draw opposition from interested groups of citizens and voters. Those groups who might oppose must be given clear notice that their interests are affected and be given a chance to object or vote no. Having sympathetic backers and villainous opponents is one key to initiative victory. Thus, the voters' pamphlet statement in favor of Initiative 901 cited the support of the American Cancer Society, the American Lung Association, the American Heart Association, Washington's nurses, and the AARP. State of Washington Voters' Pamphlet, General Election 11 (Nov. 8, 2005). The initiative opponents did not include private organizations such as the American Legion because Initiative 901 was understood not to affect them. We should hold that some new restriction affected the American Legion only if the private facilities exemption irreconcilably conflicts with the prohibition on smoking in places of employment.
ś 140 The two provisions do not conflict. The prohibition on smoking in places of employment is a general rule. The rule about private facilities is simply an exemption from this general rule. The law contains other exemptions from the place of employment ban, RCW 70.160.020(2) (exempting 25 percent of rooms in a hotel, even though they fall under the definition of "place of employment"), RCW 70.160.020(3) (exempting most home-based businesses), RCW 70.160.060 (exempting private enclosed workplaces in public buildings). The private facilities exception is similar. Since they do not conflict, the exemption for private facilities should be enforced. If the initiative backers chose to eradicate the exemption, they could and should have done so explicitly.
ś 141 The majority holds that the exemption and initiative conflict, but to do so must give the law a cramped reading. The law reads: "This chapter is not intended to restrict smoking in private facilities...." RCW 70.160.020(2). The majority holds that "this chapter" really means only "this subsection." Majority at 315-16. This is a judicial rewrite of the clear language applying the exemption to all of "this chapter." Further, this construction disregards this court's rule that initiatives must be interpreted as the average, informed lay voter would read them. W. Petroleum Imps., Inc. v. Friedt, 127 Wash.2d 420, 424, 899 P.2d 792 (1995). I strongly doubt that any average voter would think "this chapter" meant "this subsection."
ś 142 The majority's major premise for its construction is that Initiative 901 was intended to prohibit smoking in office buildings where people work. Majority at 316. I agree. But I disagree with the minor premise that public office buildings include "private facilities occasionally open to the public." This is an unnatural reading. A private facility occasionally open to the public applies to an American Legion Post (and similar facilities), and clearly does not apply to office buildings. At some point on the continuum from Elks lodge to the Columbia Tower the line is crossed from private facility to public buildings, but I do not think this stands as an argument for limiting or disregarding the statute's language. Our job is to apply the law as the average informed voter understood the exemption in RCW 70.160.020(2). Since the majority unnaturally restricts the clear meaning of that provision, I respectfully dissent.
I CONCUR: CHARLES W. JOHNSON, J.
CHAMBERS, J. (concurring in dissent).
ś 143 I agree with Justice Sanders that by its terms, RCW 70.160.020(2) exempts American Legion Post # 149, and I further agree that the act, as applied to American Legion *342 Post # 149, fails as unconstitutionally void for vagueness.
NOTES
[1] The only relevant substantive difference between the Ordinance and the Act is that the Ordinance allows the KCHD to suspend and revoke food permits if a business fails to comply with the Ordinance. Compare Clerk's Papers at 237, with RCW 70.160.070. Because the Ordinance mirrors the Act in its prohibitions and exemptions, the Ordinance and Act will collectively be referred to hereinafter as the Act.
[2] All seven employees are members of the American Legion Auxiliary (Auxiliary). Membership in the Auxiliary is limited to women who are directly related to either current members of the American Legion or deceased veterans who, if they were alive, would be entitled to membership. There are approximately 100 Auxiliary members at the Post in addition to the 591 American Legion members.
[3] No evidence was presented that the Post is ever open to the public.
[4] The trial court ruled that the Post was not entitled to judicial relief under the APA. This ruling was not appealed.
[5] The people have reserved to themselves the power to legislate directly through the initiative process. WASH. CONST. art. II, § 1(a). "In approving an initiative measure, the people exercise the same power of sovereignty as the Legislature does when enacting a statute." Amalgamated Transit, 142 Wash.2d at 204, 11 P.3d 762. Thus, the same constitutional mandate applicable to legislation applies to initiatives. Id.
[6] Former RCW 70.160.030 (1985), amended by Laws of 2006, ch. 2, § 3, prohibited smoking in public places except in designated smoking areas. Smoking in places of employment was not prohibited.
[7] RCW 70.160.020(2) defines a "`[p]ublic place'" as:

[T]hat portion of any building or vehicle used by and open to the public, regardless of whether the building or vehicle is owned in whole or in part by private persons or entities, the state of Washington, or other public entity, and regardless of whether a fee is charged for admission, and includes a presumptively reasonable minimum distance, as set forth in RCW 70.160.075, of twenty-five feet from entrances, exits, windows that open, and ventilation intakes that serve an enclosed area where smoking is prohibited. A public place does not include a private residence unless the private residence is used to provide licensed child care, foster care, adult care, or other similar social service care on the premises.
Public places include, but are not limited to: Schools, elevators, public conveyances or transportation facilities, museums, concert halls, theaters, auditoriums, exhibition halls, indoor sports arenas, hospitals, nursing homes, health care facilities or clinics, enclosed shopping centers, retail stores, retail service establishments, financial institutions, educational facilities, ticket areas, public hearing facilities, state legislative chambers and immediately adjacent hallways, public restrooms, libraries, restaurants, waiting areas, lobbies, bars, taverns, bowling alleys, skating rinks, casinos, reception areas, and no less than seventy-five percent of the sleeping quarters within a hotel or motel that are rented to guests. A public place does not include a private residence. This chapter is not intended to restrict smoking in private facilities which are occasionally open to the public except upon the occasions when the facility is open to the public.
[8] RCW 70.160.020(3) defines a "`[p]lace of employment'" as:

[A]ny area under the control of a public or private employer which employees are required to pass through during the course of employment, including, but not limited to: Entrances and exits to the places of employment, and including a presumptively reasonable minimum distance, as set forth in RCW 70.160.075, of twenty-five feet from entrances, exits, windows that open, and ventilation intakes that serve an enclosed area where smoking is prohibited; work areas; restrooms; conference and classrooms; break rooms and cafeterias; and other common areas. A private residence or home-based business, unless used to provide licensed child care, foster care, adult care, or other similar social service care on the premises, is not a place of employment.
[9] Contrary to the dissent's assertion, dissent (Sanders, J.) at 330, RCW 70.160.020(3) is a definition, not an exception.
[10] The sentence excluding private facilities was in the former Act and was not amended by Initiative 901. Compare former RCW 70.160.020(2), with RCW 70.160.020(2).
[11] The term "private facility" is not defined by the Act. It is used throughout the Act to indicate a place that falls outside of the definition of a "public place."
[12] The former Act merely stated that "tobacco smoke in closely confined spaces may create a danger to the health of some citizens of this state." Former RCW 70.160.010 (1985) (emphasis added), repealed by LAWS OF 2006, ch. 2, § 7. The new intent section states, "second-hand smoke is known to cause cancer in humans." RCW 70.160.011.
[13] The dissent's claim that Initiative 901 was a compromise and should be construed so as to not apply to the Post because similar groups were not listed as opponents in the voters' pamphlet is based on speculation and conjecture. Dissent (J.M. Johnson, J.) at 340-41. We refuse to speculate as to why the initiative passed in the absence of any relevant information in the record.
[14] Contrary to the dissent's assertions, dissent (J.M. Johnson, J.) at 341, the Act is not intended to prohibit smoking in office buildings. An office building is simply an example of a possible place of employment in a private place. In some circumstances, an office building may be a public place. However, if the building is not used by and open to the public, it is not a public place. See RCW 70.160.020(2).
[15] Contrary to the dissent's claims, dissent (J.M. Johnson, J.) at 341, this reading of the Act does not create a violation of article II, section 37 of the Washington Constitution. "`Nearly every legislative act of a general nature changes or modifies some existing statute, either directly or by implication,' but this, alone, does not inexorably violate the purposes of section 37." Citizens for Responsible Wildlife Mgmt. v. State, 149 Wash.2d 622, 640, 71 P.3d 644 (2003) (quoting Holzman v. City of Spokane, 91 Wash. 418, 426, 157 P. 1086 (1916)). Thus, article II, section 37 does not require an amendatory act to set forth all of the sections of an original act, but only those sections that are actually being amended. State v. Lawson, 40 Wash. 455, 457-58, 82 P. 750 (1905). Initiative 901 did not actually amend the exception for "private facilities which are occasionally open to the public," RCW 70.160.020(2), and, consequently, there is no article II, section 37 violation. The effect of the place of employment prohibition on the private facilities exception is a matter of statutory interpretation and not an amendment to the actual exception.
[16] The Post argues if smoking is banned in public places or places of employment, then smoking should be completely banned in all sleeping quarters within a hotel or motel that are rented to guests. We decline to address this argument because the facts for making such a determination are not properly before this court.
[17] A "workplace" is a place where work is done. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2635 (2002) (defining "workplace" as "a place (as a shop or factory) where work is done"). "Enclosed" indicates that the area is separated for individual use or closed in by some barrier. Id. at 746 (defining "enclose" as "to close in : SURROUND ; specif: to fence off or in (common land) in order to appropriate to individual use"). Finally, in this context, the term "private" means that it is either intended for individual use or not open to the public. Id. at 1804-05 (defining "private" as "intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public b: belonging to or concerning an individual person, company, or interest ").
[18] The Post asserts constitutional violations of substantive due process under the Washington and United States Constitutions, the privileges and immunities clause of the Washington Constitution, and the equal protection clause of the United States Constitution, and that the Act is unconstitutionally vague in violation of the due process clauses of the Washington and United States Constitutions. The Post does not identify which claims are based upon its own rights and which claims are asserted on behalf of its members.
[19] Both KCHD and DOH challenged the Post's standing to raise the constitutional rights of its members at the trial court.
[20] "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7.
[21] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986).
[22] The Post also argues its members have historically held a privacy interest in smoking in private facilities. The Post lacks representational standing to make this argument on behalf of its members, so we decline to address this argument.
[23] As noted above, the Post, as a corporation, cannot claim the Act violates its fundamental liberties. The Post also lacks standing to assert the Act violates the fundamental rights of its members. See supra at 318-19. However, a determination of the scope of fundamental rights or liberties is necessary for analyzing the Post's claims under article I, section 7. Thus, this section includes an analysis of whether there is a fundamental right to smoke despite the Post's inability to directly assert this claim.
[24] The federal constitution does not explicitly guarantee a right of privacy. The rights of liberty and privacy under the United States Constitution have been described as "penumbras" emanating from the Bill of Rights, Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), "zones of privacy" implicit in the Fourteenth Amendment's concept of liberty, Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), overruled on other grounds by Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), or as "the right to be let alone," Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).
[25] Under the federal due process clause, a law that interferes with certain fundamental rights and liberty interests is subject to strict scrutiny. Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997). Strict scrutiny requires that the infringement be narrowly tailored to serve a compelling state interest. Id. at 721, 117 S.Ct. 2258. A law that does not interfere with fundamental rights and liberty interests is subject to rational basis review. Id. at 728, 117 S.Ct. 2258.
[26] The Post does not argue the ban interferes with its members' expressive activities, such as speech or assembly. Thus, the issue of whether the Act interferes with First Amendment rights is not addressed.
[27] The Post lacks standing to argue that the Act interferes with its members' constitutional rights. See supra at 318-19. However, we choose to address the issue as a subset of the Post's claim that the Act violates article I, section 7 of the Washington Constitution. Because we have determined that the state constitution is not more protective than the federal constitution in the context of smoking in private facilities, the proper analysis of the article I, section 7 claim is under the federal constitution. The federal counterpart of article I, section 7 in the context of privacy rights is substantive due process, which is the foundation of a claim that a law interferes with an intimate human relationship.
[28] While the dissent questions whether undisputed scientific proof exists as to the harmful effects of secondhand smoke, dissent (Sanders, J.) at 336-39, absolute scientific proof has never been required under rational basis review. "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." Williamson v. Lee Optical of Okla., 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955).
[29] Article I, section 12 of the state constitution provides, "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."
[30] "[W]hen determining whether the Washington privileges and immunities clause provides more protection than the United States Constitution, this court has always compared it with the federal equal protection clause rather than the federal privileges and immunities clause." Grant County II, 150 Wash.2d at 805 n. 10, 83 P.3d 419. However, the term "privileges and immunities" under the state constitution is defined in accordance with the federal constitution's privileges and immunities clause. Id. at 813, 83 P.3d 419; State v. Vance, 29 Wash. 435, 458, 70 P. 34 (1902).
[31] To qualify as a suspect class, "the class must have suffered a history of discrimination, have as the characteristic defining the class an obvious, immutable trait that frequently bears no relation to ability to perform or contribute to society, and show that it is a minority or politically powerless class." Andersen, 158 Wash.2d at 19, 138 P.3d 963.
[32] The dissent argues the Act violates equal protection because a private place of employment is treated differently than a public place of employment. Dissent (Sanders, J.) at 338-39. This argument was not raised by the parties. We will not consider this issue in the absence of any briefing by the parties. Amalgamated Transit, 142 Wash.2d at 203, 11 P.3d 762.
[33] In the first case proffered by the Post, a state court upheld a smoking ban that applied to enclosed state buildings, while excluding other areas, such as bowling alleys and small restaurants. Rossie v. Dep't of Revenue, 133 Wis.2d 341, 354-56, 395 N.W.2d 801 (Ct.App.1986). The classification was sustained on the basis that the exempted places could easily be avoided by nonsmokers. Id. at 355, 395 N.W.2d 801. In the second case, restaurant and bowling alley owners challenged smoking regulations promulgated by a county department of health. Leonard v. Dutchess County Dep't of Health, 105 F.Supp.2d 258, 259 (S.D.N.Y.2000). The court determined the department violated New York's separation of powers doctrine when it exceeded the powers delegated to the department. Id. at 262-63, 268. Similarly, in the final case proffered by the Post, a court determined a county health board acted outside of its rule making authority when it made distinctions reserved for the legislature. City of Roanoke Rapids v. Peedin, 124 N.C.App. 578, 589-90, 478 S.E.2d 528 (1996). It is unclear how this relates to the Post's claim that the legislature did not have a rational basis in its statutory classifications.
[34] The United States Supreme Court has indicated that if a statute imposes only a civil penalty, the standards for vagueness are relaxed. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("[t]he Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe"); see also Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 92 L.Ed. 840 (1948). We choose not to apply a more relaxed standard in this case.
[1] The State argues the Act is presumed constitutional and such presumption may be overcome only by proof beyond a reasonable doubt. Such a presumption has no place in our constitutional system. Island County v. State, 135 Wash.2d 141, 155-70, 955 P.2d 377 (1998) (Sanders, J., concurring). Moreover, if any presumption exists it is a "[p]resumption of [l]iberty" wherein the State must prove "the necessity and propriety of its restrictions on liberty." RANDY E. BARNETT, RESTORING THE LOST CONSTITUTION: THE PRESUMPTION OF LIBERTY 273 (2004); see also Andersen v. King County, 158 Wash.2d 1, 52, 138 P.3d 963 (2006) ("[T]he State has met its burden in demonstrating that DOMA [Washington's 1998 Defense of Marriage Act] meets the minimum scrutiny required by the constitution."); Richard A. Epstein, Preface to ROBERT A. LEVY & WILLIAM MELLOR, THE DIRTY DOZEN: HOW TWELVE SUPREME COURT CASES RADICALLY EXPANDED GOVERNMENT AND ERODED FREEDOM xviii (2008) ("A free society requires judges to enforce, and political actors to respect, the principles of limited government. That vital objective can only be achieved if courts understand that government regulation should be examined, in most constitutional contexts, under a presumption that the regulation is impermissible.").
[2] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1804 (2002) (emphasis added).
[3] WEBSTER'S, supra, at 812-13 (emphasis added).
[4] WEBSTER'S, supra, at 2635 (emphasis added).
[5] See, e.g., ch. 49.60 RCW (Washington's Law Against Discrimination).
[6] Under the majority's reasoning, smoking is permitted in the enclosed manager's office at a retail store in the local mall, "even though such workplace may be visited by nonsmokers." RCW 70.160.060. But it is absurd to reason the voters intended smoking to occur at a public place of employment but not at a private one, which is equally a place of employment, when the Act expressly excludes both.
[7] See RCW 49.60.040(3) (excluding "any religious or sectarian organization not organized for private profit" from employment discrimination laws).
[8] The single nonsmoker auxiliary member who is also an employee would prefer smoking to continue at the Post Home. Clerk's Papers at 106.
[9] "`To the 47 States of the Union and the Soviet of Washington'" is a toast attributed to James "`Big Jim'" Farley, U.S. Postmaster and national Democratic Party leader, in the mid-1930s. Walt Crowley, "Washington State Politicsâ Its Past, Present, and Utterly Unpredictable Future," address to the Western Caucus of the Democratic National Central Committee in Seattle, Washington (May 24, 2002), transcript available at http://www.historylink.org/essays/output.cfm?file_id= 5451.
[10] The aggressive antismoking campaign of National Socialist Germany is well documented. Aviation W. Corp. v. Dep't of Labor & Indus., 138 Wash.2d 413, 457 n. 19, 980 P.2d 701 (1999) (Sanders, J., dissenting).
[11] U.S. CONST. amend. XIII, § 1 ("Neither slavery nor involuntary servitude . . . shall exist within the United States, or any place subject to their jurisdiction.").
[12] "[N]or shall any state deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.
[13] The majority recognizes the vagueness standard is relaxed when the sanction is civil rather than criminal and claims to apply the more rigorous standard. Majority at 327 n. 34. However, this clear dodge of the issue calls the majority's assertion into doubt. Every person subject to the prohibition has a due process right to know what conduct is prohibited so that he or she may act accordingly. Grayned, 408 U.S. at 108, 92 S.Ct. 2294.
[14] For the sake of clarity I avoid the Gordian knot of standing analysis the majority weaves throughout its opinion. The Post Home clearly has standing to enforce its and its members' right of intimate association. See Roberts v. U.S. Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987).
[15] WILLIAM SHAKESPEARE, THE LIFE OF KING HENRY THE FIFTH, act 4, sc. 3.
[16] That there are 591 members of the Post Home does not negate the intimacy, but rather comments on this nation's foreign policy over the last 50 or more years. Nor can the intimacy be diminished by the fact of the members not being
[17] In a motion for summary judgment, all facts and reasonable inferences are viewed in a light most favorable to the nonmoving party. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982).
[18] As articulated by Professor Barnett:

[T]here is a private domain within which persons may do as they please, provided their conduct does not encroach upon the rightful domain of others. As long as their actions remain within this rightful domain, other personsâ including persons calling themselves government officialsâ should not interfere without compelling justification.
RANDY E. BARNETT, RESTORING THE LOST CONSTITUTION: THE PRESUMPTION OF LIBERTY 58 (2004).
[19] U.S. Envtl. Prot. Agency, Office of Research & Dev., Office of Health & Envtl. Assessment, Wash., D.C., Respiratory Health Effects of Passive Smoking (Also Known as Exposure to Secondhand Smoke or Environmental Tobacco Smoke ETS), EPA/600/6-90/006F (1992), available at http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=2835.
[20] Environmental Tobacco Smoke: Hearing Before the Subcomm. on Health & the Env't of the Comm. on Energy & Commerce H. Rep., 103d Cong. 3 (1993) (statement of Rep. Thomas J. Bliley, Jr., Member, Comm. on Energy & Commerce).
[21] See James E. Enstrom & Geoffrey C. Kabat, Environmental Tobacco Smoke and Tobacco Related Mortality in a Prospective Study of Californians, 1960-98, 326 BRIT. MED. J. 1057 (2003), available at http://bmj.bmjjournals.com/cgi/content/full/326/7398/1057.
[22] Id.
[23] See James E. Enstrom, Defending Legitimate Epidemiologic Research: Combating Lysenko Pseudoscience, 4 EPIDEMIOLOGIC PERSPECTIVES & INNOVATIONS (Oct. 10, 2007) (defending his findings against antismoking advocates), available at http://www.epi-perspectives.com/content/4/1/11; Carl V. Phillips, Warning: Anti-tobacco Activism May Be Hazardous to Epidemiologic Science, 4 EPIDEMIOLOGIC PERSPECTIVES & INNOVATIONS (Oct. 22, 2007), available at http://www.epi-perspectives. com/content/4/1/13.
[24] Vladimir Lenin's What Is To Be Done? (1902) is a political pamphlet whose title was inspired by the homonymous novel written by Nikolai Chernyshevskii and published in 1863. See Martin E. Malia, The Soviet Tragedy: A History of Socialism in Russia, 1917-1991, 74 (1994).
[25] Elizabeth M. Whelan, Editorial, Warning: Overstating the Case Against Secondhand Smoke is Unnecessaryâ and Harmful to Public Health Policy, AM. COUNCIL ON SCI. & HEALTH (posted Aug. 1, 2000), available at http://www.acsh.org/healthissues/newsID.248/healthissue_detail.asp.
[26] Regulation of conduct based on questionable science may be politically expedient, but political expediency is no reason to infringe on freedom.
[27] Michael Siegel, Is the Tobacco Control Movement Misrepresenting the Acute Cardiovascular Health Effects of Secondhand Smoke Exposure? An Analysis of the Scientific Evidence and Commentary on the Implications for Tobacco Control and Public Health Practice, 4 EPIDEMIOLOGIC PERSPECTIVES & INNOVATIONS (Oct. 10, 2007), available at http://www.epiperspectives.com/content/4/1/12; see also Phillips, supra, n. 23.
[28] Unlike the majority's assertion, the day has yet to pass when the Due Process Clause no longer protects an individual's interest in liberty and self-autonomy. See Lawrence v. Texas, 539 U.S. 558, 562, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003); Planned Parenthood, 505 U.S. 833, 112 S.Ct. 2791; see also County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (observing the Due Process Clause protects an individual against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective").
[29] Instead the majority unjustifiably limits review of whether the Act violates the Post Home's equal protection rights, elevating form over substance by alleging the argument is not presented. Majority at 326-27 n. 32. Yet a fair reading of the briefs indicates otherwise. Opening Br. of Appellant at 27-28 (arguing, "[b]urdening the property of some `private facilities' with a smoking ban but not others . . . violates equal protection"); Br. of Resp't at 23-25 (responding to appellant's argument). The majority's myopic view of the arguments presented is curious but ultimately understandable to reach its preferred result.
[30] WEBSTER'S, supra, at 2635.
[31] See id. at 743 (defining "employee," "employer," and "employment"); id. at 2634 (defining "work").
[32] I wonder if the Act envisions a cause of action for wrongful termination of an employee who refuses to meet her manager in her manager's office because her manager smokes?
[33] WEBSTER'S, supra, at 1804.
[1] An important but unbriefed constitutional issue arises under article I, section 7 of the state constitution because of the entry of enforcement agents into private facilities without warrant or informing of the right to refuse entry. State v. Ferrier, 136 Wash.2d 103, 116, 960 P.2d 927 (1998). Are the rights of suspected felons to be better respected and protected than the rights of military veterans?